Nos. 21-4584(L), 21-4589

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

COMMONWEALTH OF VIRGINIA,
*Appellant*,

v.

ALEJANDRO AMAYA,

*and*

COMMONWEALTH OF VIRGINIA,
*Appellant*,

v.

LUCAS VINYARD.

On Appeal from the United States District Court
for the Eastern District of Virginia

## BRIEF OF APPELLANT

MARK R. HERRING
  *Attorney General*
ERIN B. ASHWELL
  *Chief Deputy Attorney General*
STEVE T. DESCANO
  *Commonwealth's Attorney for
  Fairfax County*
KYLE MANIKAS
  *Chief Deputy Commonwealth's
  Attorney*

January 11, 2022

MICHELLE S. KALLEN
  *Solicitor General*
BRITTANY M. JONES
A. ANNE LLOYD
  *Deputy Solicitors General*
ROHINIYURIE TASHIMA
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ................................................... iii

INTRODUCTION .................................................................... 1

JURISDICTION .......................................................................... 2

ISSUES PRESENTED ............................................................... 3

STATEMENT ............................................................................. 3

    I.   Factual Background ....................................................... 4

        A. The United States Park Police ............................. 4

        B. Officer Alejandro Amaya ..................................... 6

        C. Officer Lucas Vinyard ......................................... 6

        D. The Death of Bijan Ghaisar ................................ 7

            1. The Parkway Stop ......................................... 8

            2. The West Boulevard Stop ............................. 9

            3. The Alexandria Avenue Stop ....................... 11

            4. The Aftermath .............................................. 12

    II.  Procedural Background ........................................... 13

SUMMARY OF ARGUMENT ................................................. 14

STANDARD OF REVIEW ...................................................... 17

ARGUMENT ........................................................................... 21

    I.   Amaya and Vinyard have not shown entitlement to Supremacy Clause immunity ................................. 22

        A. Amaya and Vinyard are not entitled to Supremacy Clause immunity because a reasonable trier of fact could conclude that they were not authorized by federal law to act as they did ......................................... 25

            1. Amaya and Vinyard's actions were inconsistent with federal law and Park Police policy ...................... 255

2. Amaya and Vinyard's authority did not extend to violations of the Constitution and to actions taken with criminal intent ........................................................ 37

B. Amaya and Vinyard are not immune because they failed to eliminate any genuine dispute that their actions were no more than necessary and proper in performing their federal duties .......................................... 43

1. Amaya and Vinyard's actions exceeded what was necessary and proper under the *Neagle* test .............. 433

2. A reasonable trier of fact could disagree with Amaya and Vinyard's summary assertions that they had a subjective belief that Ghaisar posed a risk to officers or the public, and could find that any such subjective belief was not objectively reasonable ................................................................... 466

C. The district court ignored genuine factual issues and construed the facts in the light most favorable to Amaya and Vinyard ......................................................... 544

II. These state prosecutions should be remanded to state court because Amaya and Vinyard's failure to raise a colorable federal defense meant that the district court did not have jurisdiction ................................................................. 59

CONCLUSION ......................................................................... 61

STATEMENT REGARDING ORAL ARGUMENT .............................. 633

CERTIFICATE OF COMPLIANCE ..................................................... 633

CERTIFICATE OF SERVICE ............................................................ 644

# TABLE OF AUTHORITIES

Page

## Cases

*Adams v. Bain*,
   697 F.2d 1213 (4th Cir. 1982) ................................................ 18, 20

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ........................................................... 51

*Arizona v. Manypenny*,
   451 U.S. 232 (1981) .............................................. 21, 24, 59

*Baker v. Grice*,
   169 U.S. 284 (1898) .............................................. 22, 24, 47

*Barlow v. Colgate Palmolive Co.*,
   772 F.3d 1001 (4th Cir. 2014) .......................................... 17

*Bender v. Williamsport Area Sch. Dist.*,
   475 U.S. 534 (1986) ............................................................. 3

*Birsch v. Tumbleson*,
   31 F.2d 811 (4th Cir. 1929) ............................................ 22

*Clem v. Corbeau*,
   284 F.3d 543 (4th Cir. 2002) .......................................... 38

*Colorado v. Symes*,
   286 U.S. 510 (1932) .............................................. 23, 25, 40

*Cox v. Shalala*,
   112 F.3d 151 (4th Cir. 1997) .......................................... 47

*Cunningham v. Neagle*,
   135 U.S. 1 (1890) ..................................................... passim

*Decohen v. Capital One, N.A.*,
   703 F.3d 216 (4th Cir. 2012) .......................................... 47

*Denson v. United States*,
   574 F.3d 1318 (11th Cir. 2009) .................................. 37, 47

*Dixon v. Coburg Dairy, Inc.*,
   369 F.3d 811 (4th Cir. 2004) (en banc) ........................... 60

*Drummond ex rel. Drummond v. Anaheim,*
  343 F.3d 1052 (9th Cir. 2003) ........................................................51

*Ellenburg v. Spartan Motors Chassis, Inc.,*
  519 F.3d 192 (4th Cir. 2008) ..........................................................17

*Graham v. Connor,*
  490 U.S. 386 (1989) .......................................................................38

*Gutierrez v. San Antonio,*
  139 F.3d 441 (5th Cir. 1998) ..........................................................51

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ..................................................................47, 48

*Harris v. Pittman,*
  927 F.3d 266 (4th Cir. 2019) .....................................................38, 39

*Huffman v. Pursue, Ltd.,*
  420 U.S. 592 (1975) .......................................................................59

*Idaho v. Horiuchi,*
  253 F.3d 359 (9th Cir. 2001) ...................................................passim

*In re Fair,*
  100 F. 149 (C.C.D. Neb. 1900) ......................................................40

*In re KBR, Inc., Burn Pit Litig.,*
  744 F.3d 326 (4th Cir. 2014) ..........................................................17

*Isaac v. Googe,*
  284 F. 269 (5th Cir. 1922) .................................................25, 36, 37

*Kentucky v. Long,*
  837 F.2d 727 (6th Cir. 1988) .............................................19, 20, 55

*Kerns v. United States,*
  585 F.3d 187 (4th Cir. 2009) .............................................18, 19, 20

*Kokkonen v. Guardian Life Ins.,*
  511 U.S. 375 (1994) .......................................................................17

*Martin v. Broadview Heights,*
  712 F.3d 951 (6th Cir. 2013) ..........................................................51

*Martin v. Cavalier Hotel Corp.,*
  48 F.3d 1343 (4th Cir. 1995) ....................................................39, 48

iv

*Maryland v. DeShields*,
   829 F.2d 1121 (4th Cir. 1987) .................................................. 37, 40

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) ..................................................................... 22, 24

*Mesa v. California*,
   489 U.S. 121 (1989) ............................................................. 2, 17, 60

*Morgan v. California*,
   743 F.2d 728 (9th Cir. 1984) ............................................................ 23

*Mulcahey v. Columbia Organic Chems. Co.*,
   29 F.3d 148 (4th Cir. 1994) ...................................................... 17, 60

*New York v. Tanella*,
   374 F.3d 141 (2d Cir. 2004)..................................................... passim

*Patterson v. New York*,
   432 U.S. 197 (1977) ............................................................. 1, 21, 24

*Rice v. Rivera*,
   617 F.3d 802 (4th Cir. 2010) .............................................................. 3

*Sotnikau v. Lynch*,
   846 F.3d 731 (4th Cir. 2017) ............................................................ 41

*Stephens v. County of Albemarle*,
   524 F.3d 485 (4th Cir. 2008) .............................................................. 2

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ............................................................................... 39

*Texas v. Kleinert*,
   855 F.3d 305 (5th Cir. 2017) ...................................................... 46, 48

*United States ex rel. Bradshaw v. Alldredge*,
   432 F.2d 1248 (3d Cir. 1970).............................................. 39, 48, 56

*United States ex rel. Drury v. Lewis*,
   200 U.S. 1 (1906) .................................................................. 21, 24, 37

*United States v. Allen*,
   No. 17-po-7135, 2018
   WL 1035770 (D. Md. Feb. 23, 2018) ............................................... 33

*United States v. Feliciana*,
   974 F.3d 519 (4th Cir. 2020) .............................................................. 5

*United States v. Hernandez-Ayala,*
    No. 16-po-4622, 2017
    WL 2666243 (D. Md. June 21, 2017) .............................................. 33

*United States v. Jones,*
    428 F. Supp. 2d 497 (W.D. Va. 2006) .............................................. 33

*United States v. LaFountain,*
    No. 12-po-6164, 2013
    WL 391153 (D. Mass. Jan. 29, 2013) .............................................. 33

*United States v. Ryan,*
    731 F.3d 66 (1st Cir. 2013) .............................................. 5

*United States v. Weaver,*
    659 F.3d 353 (4th Cir. 2011) .............................................. 18, 54

*Velasco v. Government of Indonesia,*
    370 F.3d 392 (4th Cir. 2004) .............................................. 18

*Waterman v. Batton,*
    393 F.3d 471 (4th Cir. 2005) .............................................. 39

*Weigel v. Broad,*
    544 F.3d 1143 (10th Cir. 2008) .............................................. 51

*Williams v. Strickland,*
    917 F.3d 763 (4th Cir. 2019) .............................................. 39

*Wyoming v. Livingston,*
    443 F.3d 1211 (10th Cir. 2006) .............................................. passim

## Statutes

16 U.S.C. § 1a-6(b) ................................................................ 33

28 U.S.C. § 1442 ............................................... 2, 13, 17, 59

28 U.S.C. § 1455 ...................................................... 13, 60, 61

54 U.S.C. § 102701 ............................................... passim

Va. Code Ann. § 18.2-36 ......................................... 13, 40, 41

Va. Code Ann. § 18.2-56.1 ........................................... 13, 40

Va. Code Ann. § 19.2-79 ........................................... 10, 30, 36

Va. Code Ann. § 46.2-894 .................................... 10, 28, 29, 34

## Other Authorities

*History*, National Park Serv. .................................................. 4

*George Washington Memorial Parkway Station*, National Park Serv. ... 4

*Proudly Serving Since 1791*, National Park Serv. .................... 4

Supreme Ct. of Va. Model Jury Instruction Comm., Virginia Model Jury Instructions — Civil: Release 20 (Mar. 2020) .................. 41

USPP General Order 2101 ......................................................... 6

USPP General Order 2101.02 .................................................... 5

USPP General Order 2205 ......................................................... 6

USPP General Order 2205.01 ...................................... 29, 30, 31

USPP General Order 2205.04 ........................................ passim

USPP General Order 2210 ........................................................ 11

USPP General Order 2210.01 ................................. 11, 35, 45, 53

USPP General Order 2210.03 ...................................... 11, 35

USPP General Order 3601.01 ................................................... 28

USPP General Order 3601.02 ........................................ passim

USPP General Order 3601.04 ................................................... 27

USPP General Order 3615.02 ................................................... 28

USPP General Order 3615.03 .......................................... 28, 29

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................... 17

## Constitutional Provisions

U.S. Const. amend. IV ................................................................ 38

U.S. Const. art. VI, cl. 2 ........................................................... 22

# INTRODUCTION

On November 17, 2017, United States Park Police officers Alejandro Amaya and Lucas Vinyard chased Bijan Ghaisar, an unarmed twenty-five-year-old accountant from Virginia, for miles into a residential Virginia neighborhood before fatally shooting at him ten times, including striking him four times in the head. Along the way, the officers left their own jurisdiction and violated their department's policies multiple times. The Commonwealth seeks to bring Amaya and Vinyard to justice for their actions.

Such effort of "preventing and dealing with crime is much more the business of the States than it is of the Federal Government and [courts] should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Patterson v. New York*, 432 U.S. 197, 202 (1977) (internal citation omitted). Despite the Supreme Court's warning to avoid intrusion upon States' administration of justice, the district court did just that. In opinions that glossed over genuine factual issues and construed other facts in the light favorable to the *moving parties*, the district court erroneously erected a Supremacy Clause shield around the officers. Because Amaya and Vinyard failed to

establish immunity from prosecution for killing Ghaisar and because the district court abandoned the longstanding motion-to-dismiss standard, this Court should reverse.

## JURISDICTION

After a special grand jury in Fairfax returned indictments against Amaya and Vinyard on two state criminal counts, the Commonwealth's Attorney for Fairfax County pursued state criminal charges against the officers in Virginia state court. Amaya and Vinyard removed the state criminal proceedings under 28 U.S.C. § 1442(a)(1). The district court accepted jurisdiction and ordered the cases removed.[1] JA 107–08. Because Amaya and Vinyard failed to plead a defense sufficient to justify removal, removal was improper and the district court lacked subject matter jurisdiction. See *Mesa v. California*, 489 U.S. 121, 136 (1989). This Court accordingly has jurisdiction, "not of the merits[,] but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Stephens v. County of Albemarle*, 524 F.3d 485, 490 (4th Cir.

---

[1] When Amaya and Vinyard removed the state criminal proceedings, their cases were initially docketed as civil cases—Nos. 1:20-cv-1403 and 1:20-cv-1396—before being re-docketed as criminal cases—Nos. 1:21-cr-91 and 1:21-cr-92.

2008) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)); see also *Rice v. Rivera*, 617 F.3d 802, 807 (4th Cir. 2010).

The district court granted Amaya and Vinyard's motions to dismiss on October 22, 2021.  JA 878, 886.  The Commonwealth timely appealed. JA 894–903.

## ISSUES PRESENTED

1.     Whether Amaya and Vinyard have shown entitlement to Supremacy Clause immunity such that they can escape prosecution for violating Virginia's prohibitions on reckless discharge of a firearm and involuntary manslaughter.

2.     Whether these prosecutions should be remanded to the State court because Amaya and Vinyard have not satisfied Article III's "arising under" jurisdiction requirement.

## STATEMENT

On November 17, 2017, Amaya and Vinyard shot and killed Bijan Ghaisar, a twenty-five-year-old unarmed accountant, in a residential neighborhood in Virginia.  Amaya and Vinyard's actions were inconsistent with both their training and the law.

## I. Factual Background

Federal officers "can be held accountable for violating [a] state's criminal laws." *Idaho v. Horiuchi*, 253 F.3d 359, 362 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001). As part of its longstanding commitment to protecting the rights of its people, the Commonwealth of Virginia seeks to hold Amaya and Vinyard accountable for killing Bijan Ghaisar.

### A. The United States Park Police

The United States Park Police is a division of the National Park Service within the Department of the Interior. *Proudly Serving Since 1791*, National Park Serv., https://www.nps.gov/subjects/uspp/index.htm (last updated Nov. 14, 2021). Established in 1791 to protect federal property in Washington, D.C., the Park Police operates as the principal law enforcement authority in federal parks—such as the National Mall—and over other federal property, including the George Washington Memorial Parkway. *History*, National Park Serv., https://www.nps.gov/subjects/uspp/history.htm (last updated July 3, 2017); *George Washington Memorial Parkway Station*, National Park Serv., https://www.nps.gov/subjects/uspp/district-2.htm (last updated Mar. 25, 2015).

The Park Police's statutory authorization to "maintain law and order and protect individuals and property within [National Park] System units" is limited by applicable law and Park Police General Orders. 54 U.S.C. § 102701(a)(1). Section 102701 allows officers to "carry firearms," "make arrests without warrant," and "conduct investigations," *id.* § 102701(a)(2), but officers may only exercise these powers in certain circumstances and in specific locations.[2] See, *e.g.*, *United States v. Feliciana*, 974 F.3d 519, 527 (4th Cir. 2020) (§ 102701(a)(2) "plainly does not authorize stops or inspections to enforce park regulations without warrants or suspicion"); *United States v. Ryan*, 731 F.3d 66, 68 (1st Cir. 2013).

Similarly, Park Police General Orders establish boundaries of officers' authority. For instance, General Order 2205 specifies the narrow circumstances under which vehicular pursuits are permitted, and General Order 2101 confines when and where an officer may conduct

---

[2] These include certain "designated areas," such as the District of Columbia, its "environs" (such as the City of Alexandria), and various portions of New York, New Jersey, and California. See JA 121–22 (USPP Gen. Ors. 2101.02(B)–(F)).

arrests. See JA 111–19, 121–30 (USPP Gen. Ors. 2205, 2101). These orders, and pertinent law, constrain the Park Police's power.

## B.   Officer Alejandro Amaya

Amaya joined the Park Police after completing his training at the Federal Law Enforcement Training Center (FLETC) in December 2009. JA 132–47. He received "satisfactory" marks in law enforcement driving skills, officer response tactics, and active threat response tactics. JA 132. In each year of his employment, Amaya completed refresher training courses on permissible uses of force and other law enforcement techniques. JA 149. When Amaya shot Ghaisar, Amaya held a current qualification rating for his issued firearm. JA 149; see also JA 183 (identifying the serial number of Amaya's weapon).

## C.   Officer Lucas Vinyard

Vinyard began his career with the Park Police in 2008, after completing a four-month training course at FLETC. See JA 610–27; Defendant Lucas Vinyard's Motion to Dismiss the Indictments at 3, *Commonwealth of Virginia v. Vinyard*, No. 1:21-cr-92 (E.D. Va. June 15, 2021), ECF No. 12 (Vinyard Motion to Dismiss). Vinyard received "satisfactory" marks in emergency response driving, defensive tactics,

and arrest techniques. JA 610. During each year of his employment,[3] Vinyard completed refresher training courses on permissible uses of force and other law enforcement techniques. See generally JA 671–727. At the time Vinyard shot Ghaisar, Vinyard held a current qualification rating for his issued firearm. See JA 671–727; JA 183.

### D. The Death of Bijan Ghaisar

Shortly after 7:20 PM on November 17, 2017, twenty-five-year-old Bijan Ghaisar was rear-ended by an Uber driver south of Marina Drive on the George Washington Parkway.[4] JA 185–87 (Interior Department's traffic crash report). Instead of exchanging information with the other driver, Ghaisar continued to drive. JA 190. The Uber driver's passenger reported the accident and advised the 911 operator that the other car involved was a Jeep Cherokee with the license plate "BIJAN." JA 190. The operator directed the report to Park Police.

---

[3] During Vinyard's career, two individuals launched complaints against him for excessive force, racial bias, and discourteous conduct; Vinyard was eventually exonerated. See JA 629–50 (excessive force complaint investigation); JA 652–69 (rude and discourteous conduct and racial bias investigation).

[4] The Uber driver received a citation for failure to maintain proper control of his vehicle. JA 185. The citation was later dismissed.

Around 7:32 PM, the Park Police dispatcher requested that area officers look out for the Jeep.[5] JA 109 at 5:10–36. Dispatch did not give an explicit instruction to pursue. JA 109 at 8:22–24 (Dispatch: "Are you in pursuit of this vehicle?"). Minutes later, Amaya and Vinyard located Ghaisar's vehicle and began pursuit. JA 109 at 7:30–42; see also JA 109 at 8:56–9:17. Vinyard drove the cruiser, and Amaya principally communicated with dispatch. Amaya relayed that they were driving at "49 miles per hour" and described traffic on the Parkway as "light" with "clear" road conditions. JA 109 at 9:01–07. Fairfax County Police Department Lieutenant Daniel Gohn joined the pursuit shortly after and captured much of the incident on the in-car video recorder mounted on his dashboard. JA 109 at 9:52–55. The footage shows three encounters between the officers and Ghaisar.

### 1. The Parkway Stop

At approximately 7:38 PM, Ghaisar's Jeep slowed to a halt. JA 109 at 10:01–02. Contrary to federal law enforcement training—which instructs officers to park *behind* a stopped vehicle to "[e]nhance[]"

---

[5] Dispatch's initial description incorrectly stated that Ghaisar's Jeep was the striking vehicle. It corrected its report within minutes. JA 109 at 5:51–54, 7:01–27.

illumination" and "provide[] protection from traffic," JA 208—Vinyard instead pulled the cruiser towards the *front* of Ghaisar's Jeep. JA 109 at 10:01–02. Amaya exited the cruiser from the passenger side, immediately drew his firearm, and advanced on Ghaisar's Jeep.[6] JA 109 at 10:02–04. With his weapon in his right hand, Amaya grabbed for the driver's side door handle of Ghaisar's Jeep with his left hand as Vinyard rounded the back of the cruiser. JA 109 at 10:06–07. After failing to open the door, Amaya smashed the butt of his gun against the Jeep's rear driver's side window and dropped his weapon as Ghaisar drove away. JA 109 at 10:06–10. Fairfax's Lieutenant Gohn took over the pursuit while Vinyard and Amaya reentered Vinyard's cruiser. JA 109 at 10:10. The Park Police officers resumed the lead shortly thereafter. JA 109 at 11:17.

### 2. The West Boulevard Stop

A few seconds after the Park Police officers resumed the principal pursuit position, Ghaisar signaled a right turn off the George Washington Parkway and onto West Boulevard. JA 109 at 11:36–45. Despite leaving their primary jurisdiction on the Parkway, entering the

---

[6] Park Police General Orders prohibited displays of a firearm unless "a degree of imminent danger exists." JA 240 (General Order 3601.02(D)).

Fairfax County Police Department's jurisdiction, and not knowing whether Ghaisar was suspected of committing a felony,[7] Amaya and Vinyard retained control over the pursuit.[8]

Contrary to his training, Vinyard again stopped the cruiser in front of Ghaisar's Jeep. JA 109 at 11:53. Amaya, yet again, displayed his firearm immediately as the two officers exited the cruiser. JA 109 at 11:54–56. Amaya unsuccessfully tried again to open the Jeep's door and kicked the rear quarter panel of the Jeep as Ghaisar drove away. JA 109 at 11:54–56. The officers returned to the cruiser and resumed pursuit.

---

[7] Amaya concedes that the officers "did not have information about the extent of damage to either car [Ghaisar's Jeep and the Uber driver's car] or if the crash caused injuries" and accordingly did not know "whether the crime was a felony or misdemeanor" under Virginia law. Motion to Dismiss at 5, *Commonwealth of Virginia v. Amaya*, No. 1:21-cr-91 (E.D. Va. June 15, 2021), ECF No. 8.

[8] The Park Police General Order explicitly provides that, "[a]s soon as practical," vehicle pursuits outside of the officers' primary jurisdiction "*shall* be relinquished to police units of the entered jurisdiction." USPP Gen. Or. 2205.04(B)(4) (2017) (emphasis added). Moreover, under Virginia law, officers from another jurisdiction may only continue their "close pursuit" into the Commonwealth if the person they are pursuing is suspected of "commit[ing] a *felony*." Va. Code Ann. § 19.2-79 (emphasis added). However, a driver's failure to stop after an accident is often a misdemeanor. Va. Code Ann. § 46.2-894.

### 3.   The Alexandria Avenue Stop

Around 7:41 PM, the Jeep turned westbound onto Alexandria Avenue as Amaya and Vinyard followed.  JA 109 at 11:59–12:03.  The vehicles passed a Fairfax County Police Department officer who was attempting to deploy stop sticks to deflate the Jeep's tires and bring the chase to an end.  JA 109 at 12:53–56.  The Jeep eventually stopped at the stop sign of an intersection.  JA 109 at 12:59–13:01.

Vinyard again drove his cruiser in front of Ghaisar's Jeep.  JA 109 at 13:02–07.  This time, Vinyard created a roadblock by angling the cruiser so that the passenger side was almost perpendicular to the front of the Jeep to prevent Ghaisar from passing.[9]  JA 109 at 13:02–07.

Weapon in hand, Amaya exited the front passenger seat of the cruiser and confronted Ghaisar at gunpoint for the third time.  JA 109 at 13:10–13.  Amaya slowly worked his way to his right, toward the driver's

---

[9] Under Park Police General Order 2210, a "stationary roadblock" is defined as a barricade—including a vehicle—"used to close a roadway ahead of a pursuit."  JA 261 (USPP Gen. Or. 2210.03(B)).  Stationary roadblocks are to be used only as "a last resort" to effectuate "the immediate apprehension of a fleeing suspect."  JA 260 (USPP Gen. Or. 2210.01).  Before performing a roadblock, the officer must obtain authorization from the officer's supervisor.  JA 260 (USPP Gen. Or. 2210.01).  Vinyard neither sought nor obtained the required permission.

window.  JA 109 at 13:10–14.  The Jeep inched towards the right while Amaya stood towards the left of the Jeep.  JA 109 at 13:14.  Amaya fired a shot through the Jeep's windshield and the Jeep stopped.  JA 109 at 13:14.  In fractions of a second, the brake lights disengaged.  JA 109 at 13:15.  Amaya fired three more rounds through the windshield.  JA 109 at 13:16–17.

Simultaneously, Vinyard walked around the back of the cruiser, drew his firearm, and fired his first shot at Ghaisar through the driver's window.  JA 109 at 13:16.  The brake lights reignited, JA 109 at 13:17, but dimmed as the Jeep began to creep right, JA 109 at 13:22–24.  The Jeep stopped.  JA 109 at 13:26–37.  Both officers fired another round as the Jeep rolled off the road.  JA 109 at 13:37–39.  Vinyard fired one final shot as the Jeep careened into a ditch on its right.  JA 109 at 13:40.

### 4.    The Aftermath

Once Ghaisar's Jeep fell off the road, Amaya, Vinyard, and the Fairfax County Police Department checked the Jeep for additional occupants.  JA 109 at 13:45–14:28.  Finding none, they began to render aid to Ghaisar.  JA 109 at 13:45–14:26.  Emergency Medical Services eventually transported Ghaisar to Inova Fairfax Hospital, where he died

ten days later.  JA 314.  All told, Amaya and Vinyard each fired five shots at Ghaisar.  JA 263–64; see also JA 183.  Ghaisar sustained five gunshot wounds: four to his head and one to his wrist.  JA 270–71.  The medical examiner report listed homicide as the manner of death.  JA 274.

## II.  Procedural Background

On October 15, 2020, a Fairfax special grand jury returned indictments against both officers on two state criminal counts: (a) involuntary manslaughter for "feloniously kill[ing] and slay[ing]" Ghaisar in violation of Virginia Code § 18.2-36; and (b) reckless discharge of a firearm in violation of Virginia Code § 18.2-56.1(A1).  JA 22–23; JA 24–25.  Amaya and Vinyard noticed removal under 28 U.S.C. §§ 1442 and 1455.  JA 26–30; JA 52–59.  The district court accepted jurisdiction, reasoning that the "circumstances of this case . . . have been set forth with particularity[] and [Amaya and Vinyard] have a right to exert a defense of immunity which they have a right to have tried in federal court."  JA 99; JA 107; JA 108.

Both Amaya and Vinyard moved to dismiss the indictments based on Supremacy Clause immunity.  After hearing argument, the district court concluded that Amaya and Vinyard were entitled to Supremacy

Clause immunity and dismissed the charges. JA 885; JA 893; JA 878; JA 886. In opinions entirely devoid of citations to the record, the court reasoned that Amaya and Vinyard had "acted in accordance with federal law" because they "performed their duties as expected when they responded to the hit and run call and pursued Ghaisar." JA 883–84; JA 891–92. The court also concluded that the officers' actions were "necessary and proper" because the "totality of the . . . circumstances reasonably invoked the officers' belief that Ghaisar's actions placed Officer Amaya's life in imminent, life-threatening danger." JA 884; JA 892.

The Commonwealth timely appealed, JA 894–905, and this Court consolidated both appeals, ECF No. 3 at 2.

## SUMMARY OF ARGUMENT

Because Amaya and Vinyard failed to show that all reasonable triers of fact could conclude that they acted with authority and did no more than what was necessary and proper when they pursued and killed Ghaisar, they are not shielded by Supremacy Clause immunity. This failure to raise a colorable federal defense means that Vinyard and

Amaya have not properly invoked federal jurisdiction over these state criminal prosecutions.

1.  To use Supremacy Clause immunity as a shield from state prosecution at the motion to dismiss stage, Amaya and Vinyard must show that, when construing the facts in the light most favorable to the Commonwealth, federal law authorized Amaya and Vinyard to chase and kill Ghaisar and that their actions were no more than necessary and proper. *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890). They have not made this showing. Far from eliminating any jury question, the evidence in the record shows that the officers repeatedly exceeded their authority and violated Park Police policy. These violations inherently mean their actions were not proper. Nor did Vinyard and Amaya establish that their actions necessary. The officers had numerous alternatives available, such as terminating the pursuit or at the very least complying with policy. Construing the evidence in the light most favorable to the Commonwealth, Amaya and Vinyard's decisions to use deadly force against an unarmed person who posed no threat to Amaya, Vinyard, or the general public exceeded what was necessary or proper. This Court can reverse on this ground alone.

2. The existence of multiple factual disputes also merits reversal. Although the record (including video evidence) is clear that, for instance, Ghaisar's Jeep inched *away* from Amaya when Amaya shot Ghaisar repeatedly, the district court summarily represented that the Jeep was moving towards Amaya. JA 109 at 13:14; JA 882; JA 890. The district court likewise ignored numerous factual issues the Commonwealth raised and instead construed the facts in the light most favorable to Amaya and Vinyard, the moving parties. The Commonwealth need only raise a genuine factual issue to defeat Amaya and Vinyard's motions to dismiss. *Wyoming v. Livingston*, 443 F.3d 1211, 1226 (10th Cir. 2006). The Commonwealth has met this burden. This Court should reverse.

3. Finally, the officers' failure to raise a colorable federal defense means the district court lacked jurisdiction. The district court's decisions dismissing the indictments against Amaya and Vinyard should be vacated and these state criminal prosecutions should be remanded to the Circuit Court for Fairfax County for further proceedings, including a criminal trial of Amaya and Vinyard before a jury.

## STANDARD OF REVIEW

This Court reviews de novo a district court's "determination of its subject-matter jurisdiction." *Barlow v. Colgate Palmolive Co.*, 772 F.3d 1001, 1007 (4th Cir. 2014). A remand order based on a lack of subject matter jurisdiction "may be entered at any time, for jurisdiction goes to the very power of the court to act." *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 196 (4th Cir. 2008). The "burden of establishing federal jurisdiction is placed upon the party seeking removal." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994); see also *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994). To remove their state criminal proceedings to federal court, federal officers charged with violating state law must satisfy the procedural requirements of the federal officer removal statute, 28 U.S.C. § 1442, and raise a "colorable federal defense" arising out of their duty to enforce federal law. See *Mesa v. California*, 489 U.S. 121, 129 (1989).

"On appeal from a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), [this Court] review[s] the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *In re KBR, Inc., Burn Pit Litig.*,

744 F.3d 326, 333 (4th Cir. 2014) (quoting *Velasco v. Government of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)) (internal quotation marks omitted). If the defendant challenges subject matter jurisdiction by arguing that the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based," the "facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)) (internal quotation marks omitted). In contrast, if the defendant argues the jurisdictional allegations are untrue, the "presumption of truthfulness normally accorded a complaint's allegations does not apply" and the district court may resolve factual disputes "with respect to subject matter jurisdiction." *Id.*

If the defendant moves to dismiss because of Supremacy Clause immunity, "the district court may grant the motion only if the facts supporting the immunity claim are not in dispute." *Idaho v. Horiuchi*, 253 F.3d 359, 367 (9th Cir. 2001); *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) ("[A] district court may consider a pretrial motion

to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts."). The evidence is viewed in the light most favorable to the non-moving party. *Horiuchi*, 253 F.3d at 367 ("In determining whether material facts are in dispute, the district court must give the non-moving party the benefit of all doubts, both as to the basic facts and the inferences to be drawn from those facts."); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004); *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988).

Amaya and Vinyard argued that their alleged entitlement to Supremacy Clause immunity required that the district court dismiss the indictments. See Motion to Dismiss at 1, *Commonwealth of Virginia v. Amaya*, No. 1:21-cr-91 (E.D. Va. June 15, 2021), ECF No. 8 (Amaya Motion to Dismiss); Vinyard Motion to Dismiss at 1. Nowhere did they argue that the district court lacked subject matter jurisdiction because the allegations in the indictments were untrue. Because Amaya and Vinyard did not allege that the allegations in the indictments were untrue, the Commonwealth's factual allegations "are taken as true." See *Kerns*, 585 F.3d at 192. To the extent that "the jurisdictional facts are

intertwined with the facts central to the merits of the dispute, a presumption of truthfulness should attach to the [Commonwealth's] allegations." *Id.* at 193 (quoting *Adams*, 697 F.2d at 1219) (internal quotation marks omitted).

This Court has yet to adopt a standard of review specifically for Supremacy Clause immunity cases. However, other courts have developed a modified standard of review for these cases. These courts apply the presumption of truthfulness to the factual allegations contained in the State's indictment. *Wyoming v. Livingston*, 443 F.3d 1211, 1226 (10th Cir. 2006) ("The appellate court must review the evidence in the light most favorable to the non-moving party and assume the truth of the allegations in the indictment."); *Tanella*, 374 F.3d at 148 ("[W]e view the evidence in the light most favorable to the State and assume the truth of the allegations in the indictment."). If the defendant raises a Supremacy Clause immunity defense, the low burden of showing "a genuine factual issue whether the federal officer was doing no more than what was necessary and proper for him to do in the performance of his duties" shifts to the State. *Tanella*, 374 F.3d at 148 (quoting *Long*,

837 F.2d at 752) (internal emphasis, quotation marks, and alterations omitted); see also *Livingston*, 443 F.3d at 1226.

## ARGUMENT

"Under our federal system," the task of "preventing and dealing with crime is much more the business of the States than it is of the Federal Government." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (quoting *Patterson v. New York*, 432 U.S. 197, 201 (1977)) (internal quotation marks and alteration omitted). A "State's interest in enforcing its criminal laws," therefore, "merits comparable judicial respect when pursued in the federal courts." *Id.*

To escape state prosecution, Amaya and Vinyard must show that all reasonable triers of fact would conclude that: (1) the officers had authority to act as they did; and (2) they did no more than what was necessary and proper. See *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8 (1906) (rejecting Supremacy Clause immunity when "there was a conflict of evidence as to whether [the victim] had or had not surrendered"); *Idaho v. Horiuchi*, 253 F.3d 359, 366 n.9 (9th Cir. 2001) ("*Drury* actually holds . . . [that] [e]ven if it is *not* clear that the federal agents acted unlawfully, the state may proceed with the prosecution if it

has evidence which, if believed, would render the federal agents' conduct unlawful."). Amaya and Vinyard did not make this showing and the district court erred in concluding otherwise.

## I. Amaya and Vinyard have not shown entitlement to Supremacy Clause immunity

The Supremacy Clause declares: "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. This provision ensures that states do not "impede," "burden," or "control" the execution of federal law. *McCulloch v. Maryland*, 17 U.S. 316, 317 (1819). The Supremacy Clause, however, only protects federal officers from state prosecutions in "exceptional" circumstances where enforcement of state law actually interferes with enforcement of federal law. *Baker v. Grice*, 169 U.S. 284, 291 (1898) ("Unless [a] case be of such an exceptional nature, [courts] ought not to encourage the interference of the federal court . . . with the regular course of justice in the state court."); see also *Birsch v. Tumbleson*, 31 F.2d 811, 814 (4th Cir. 1929) (explaining that the cases in which the Fourth Circuit discharged petitioners in advance of trial on the merits involved "*emergencies*" and were "*unusual* in that they present[ed]

considerations which would not ordinarily arise, and in which the propriety of the acts of the federal officers was beyond question, and involved matters necessary to the orderly conduct of the business of the courts of the United States, and the enforcement of the federal laws" (emphasis added)); accord *Morgan v. California*, 743 F.2d 728, 731 (9th Cir. 1984) ("The power of the federal court to enjoin state criminal prosecutions . . . should be sparingly exercised."). "Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Colorado v. Symes*, 286 U.S. 510, 518 (1932).

Supremacy Clause immunity is available only if the federal officer establishes that: (1) the officer was performing an act that the officer was authorized to do by federal law; and (2) in doing so, the officer did "*no more* than what was necessary and proper for him to do." *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) (emphasis added). The purpose of this test is to identify the extraordinary cases where a State's prosecution will "nullify[] federal laws by attempting to impede enforcement of those laws." *Morgan*, 743 F.2d at 731 (citing *Neagle*, 135 U.S. 1); see also

*McCulloch*, 17 U.S. at 317.[10]  Reserving Supremacy Clause immunity for cases of "an exceptional nature," *Baker*, 169 U.S. at 291, accounts for the reality that Supremacy Clause immunity undermines the States' "pre-eminent[]" power "to make and enforce [their] own criminal laws," *Manypenny*, 451 U.S. at 243.  Indeed, the Supreme Court has been clear that courts "should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Patterson*, 432 U.S. at 201.

Amaya and Vinyard have failed to meet their high burden of showing that every reasonable trier of fact would conclude that (1) they were performing an act that they were authorized to do by federal law; and (2) their actions were "*no more* than what was necessary and proper for [them] to do." *Neagle*, 135 U.S. at 75 (emphasis added).  Their failure to make this showing requires reversal.

---

[10] Accord *Drury*, 200 U.S. at 6–7 (discussing *Neagle*, and explaining that the circumstances of *Neagle* were "peculiar" and "extraordinary" and that the case was decided on "exceptional facts").

**A.** Amaya and Vinyard are not entitled to Supremacy Clause immunity because a reasonable trier of fact could conclude that they were not authorized by federal law to act as they did

"For a federal official to be exempt from civil or criminal liability under state law," it is well-settled that "it is not enough that . . . he was present for an official purpose." *Isaac v. Googe*, 284 F. 269, 270 (5th Cir. 1922); see also *Symes*, 286 U.S. at 518. Rather, to be entitled to Supremacy Clause immunity, Amaya and Vinyard must show that, even when construing the facts in the light most favorable to the Commonwealth, killing Ghaisar was "an act which [they] were authorized to do" by federal law. *Neagle*, 135 U.S. at 75; *Isaac*, 284 F. at 270. Amaya and Vinyard fail the authorization prong of Supremacy Clause immunity twice: *first*, because their actions were outside the statutory authority of Park Police officers; and *second*, because officers per se lacks authority when they violate the Constitution or act with criminal intent.

**1.** Amaya and Vinyard's actions were inconsistent with federal law and Park Police policy

The "mere fact that one is an officer of the United States . . . does not exempt him from civil or criminal liability for what he does beyond the scope of his official duties and not in the discharge thereof." *Isaac*,

284 F. at 270. Amaya and Vinyard's actions throughout their encounter with Ghaisar defied Park Police policy and exceeded the scope of their official duties. Even if the record were not rife with examples of these violations, whether Amaya and Vinyard's interpretation of Park Police policy was reasonable is a genuine factual dispute that requires reversal.

a. *Amaya repeatedly exceeded his limited authority to use and display his firearm.* Amaya represented to the district court (citing no evidence) that Park Police firearm policy is "when in doubt[,] pull it out." JA 839 (counsel for Amaya arguing that "the Park Police [] said something to the effect of within his training, when in doubt pull it out, meaning pull out that gun because that's the safer thing to do"); JA 869 (same). Far from adopting a "when in doubt, pull it out" approach to firearm use, Park Police policy is clear that an officer "shall . . . only draw or display a firearm when, in the officer's judgment, a degree of imminent danger exists that necessitates the possible use of the firearm for the officer's safety or the safety of others." JA 239–40 (USPP Gen. Or. 3601.02(D)).

Yet, at each stop, Amaya immediately drew his firearm and pointed it directly at Ghaisar. JA 109 at 10:03–05 (Amaya immediately drawing

his firearm during the first stop); JA 109 at 11:54–56 (Amaya drawing his weapon at the second stop); JA 109 at 13:10–13 (Amaya confronting Ghaisar at gunpoint for the third and final time). Amaya continued to aim his firearm at Ghaisar even as Ghaisar drove away. JA 109 at 11:54–56. And although Amaya had an obligation to "immediately notify" his supervisor "by radio or other available means" if circumstances required him to display his firearm, JA 243 (USPP Gen. Or. 3601.04(E)), nothing in the record suggests he did so, even though Amaya largely communicated with dispatch.

b. *Amaya violated Park Police policy by striking Ghaisar's Jeep with his firearm.* Amaya also directly contravened Park Police policy when he used his firearm as an impact weapon to strike Ghaisar's car. JA 109 at 10:06–10; JA 240. Park Police policy prohibits officers from "us[ing] a firearm [] as an impact weapon . . . except to protect an officer or another person from death or serious injury when no other reasonable means of protection [are] available." JA 240 (USPP Gen. Or. 3601.02(C)). Amaya smashed the butt of his gun against Ghaisar's Jeep as Ghaisar drove *away* from Amaya. JA 109 at 10:06–10. Ghaisar driving away from Amaya did not constitute a threat of death or serious injury, and

Amaya's decision to violate policy by using his firearm as an impact weapon was not reasonable. To the extent that it is unclear whether smashing a firearm into a slowly departing vehicle was unreasonable, this question is a genuine factual issue that the district court did not consider, let alone evaluate.

c. *Amaya and Vinyard exceeded any authorization to use force.*
Park Police officers' use of a firearm is "limited to incidents that involve the potential loss of life or serious physical injury." JA 239 (USPP Gen. Or. 3601.01). The limited circumstances in which officers may use deadly force were absent in this case.

Park Police officers must "employ only the minimum level of force necessary to control a situation." JA 283 (USPP Gen. Or. 3615.02). Use of deadly force is "only justified" if an individual "committed a felony involving the infliction or threatened infliction of serious physical injury or death" and the individual's escape "would pose an imminent threat of serious physical harm." JA 284–85 (USPP Gen. Ors. 3615.03(C)(2)(a)–(b)). The defendants contended that Ghaisar was suspected of leaving the scene of an accident in violation of Virginia Code § 46.2-894. Amaya Motion to Dismiss at 9; Vinyard Motion to Dismiss at 6. As Amaya

himself recognized, violation of this statute will often be a misdemeanor. See Amaya Motion to Dismiss at 5 (Amaya explaining that he "did not have information" to determine "whether the crime was a felony or misdemeanor offense"). Vinyard likewise based his use of deadly force on "a *possible* Class 5 felony under V.A. Code § 46.2-894." Vinyard Motion to Dismiss at 6 (emphasis added). Construing the facts in the light most favorable to the Commonwealth, any alleged violation of Virginia Code § 46.2-894 did not satisfy the conditions necessary to justify Amaya and Vinyard's use of deadly force. See JA 284–85 (USPP Gen. Or. 3615.03(C)(2)).

d. *Amaya and Vinyard exceeded their pursuit authority.* Neither Park Police policy nor Virginia law authorize the actions Amaya and Vinyard took in pursuing Ghaisar. Under Park Police policy, "[t]he act of fleeing and eluding the police shall not in itself be a pursuable offense." JA 111 (USPP Gen. Or. 2205.01). Vehicular pursuits are authorized only when an officer believes or has reason to believe that a *felony* has occurred or when "[t]he suspect presents a clear and immediate threat to public safety if not immediately apprehended." JA 111 (USPP Gen. Or. 2205.01). The same is true under Virginia Law. See

Va. Code § 19.2-79 (emphasizing that law enforcement officers who "enter[] this Commonwealth in close pursuit" can follow a fleeing suspect "on the ground that he has committed a felony"). But when Amaya and Vinyard initiated pursuit,[11] it was far from clear that Ghaisar had committed any felony—a point Amaya himself conceded. See Amaya

---

[11] Vinyard claimed before the district court that his pursuit was authorized because it was initiated by dispatch and his supervisors did not order him to stop. Vinyard Motion to Dismiss at 21. Neither contention justifies his conduct. As a factual matter, dispatch did not actually *instruct* Vinyard to initiate the pursuit. Compare *id.* at 6 ("Vinyard did not initiate the pursuit, but was instructed to do so by dispatch.") with JA 109 at 8:22–23 (Dispatch asking (not instructing): "Are you in pursuit of this vehicle?"). Under Park Police General Order 2205.04, "the decision to initiate a pursuit must be based on the *pursuing officer's* conclusion that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large." JA 112–13 (USPP Gen. Or. 2205.04(A)(2)) (emphasis added). In other words, officers are not permitted to outsource their decision-making to dispatch and must decide whether to initiate a pursuit for themselves. If the "necessity of an immediate apprehension" does not outweigh "the level of danger created by the pursuit," JA 111 (USPP Gen. Or. 2205.01), the pursuit "may be terminated" by *either* the pursuing officer *or* the officer's supervisor "at any time," JA 113 (USPP Gen. Or. 2205.04(A)(5)). The pursuing officer's ability to terminate a pursuit is especially true where, as here, the supervisor may not have had enough information to make an informed decision, JA 476, and "[t]he suspect's identity ha[d] been established and the need for immediate apprehension [was] no longer present," JA 113 (USPP Gen. Or. 2205.04(A)(4)(b)). Vinyard's supervisor's failure to intervene does not excuse—let alone authorize—Vinyard's pursuit outside of Park Police jurisdiction.

Motion to Dismiss at 5 (Amaya explaining that he "did not have information" to determine "whether the crime was a felony or misdemeanor offense"). And whether Ghaisar presented a threat to public safety too was less than clear when Vinyard and Amaya initiated the pursuit. See JA 397 (noting that Vinyard's actions were inconsistent with Vinyard viewing Ghaisar as a threat); JA 411 (explaining, "[a] reasonable officer placed in Officer Amaya's position would not have reasonably believed Mr. Ghaisar was an imminent threat . . . based upon the information [Amaya] possessed during this evolution of the incident").

Even had pursuit been justified at the outset, continuing to chase Ghaisar off the George Washington Parkway was not. Under the Park Police General Orders, vehicular pursuits are only authorized in "areas of primary Force jurisdiction." JA 111 (USPP Gen. Or. 2205.01). When pursuits extend outside these locations, officers must "relinquish[] [the pursuit] to police units of the entered jurisdiction" "[a]s soon as practical." JA 115 (USPP Gen. Or. 2205.04(B)(4)). Amaya and Vinyard nevertheless pursued Ghaisar well into a residential neighborhood outside Park Police's primary jurisdiction and into the Fairfax County Police

Department's domain.  See, *e.g.*, JA 109 at 11:36–45 (pursuit continuing onto West Boulevard).

Amaya and Vinyard's refusal to relinquish control is especially unreasonable because: (i) they had requested assistance from the Fairfax County Police Department; and (ii) members of the Fairfax County Police Department were actively attempting to render aid.  See, *e.g.*, JA 109 at 12:53–56 (showing Fairfax Officer attempting to deploy stop sticks on Alexandria Avenue).  Amaya and Vinyard's actions thus exceeded their pursuit authority.

e.    *Amaya and Vinyard exceeded their arrest authority.*  Park Police officers' power to make warrantless arrests is limited. Warrantless arrests are permitted only "within the [National Park] System" or outside of the system when the arrestee "is fleeing from the System to avoid arrest" for "any offense *against the United States* committed in the presence of [an] officer" or "any *felony* cognizable under the laws of the United States."  54 U.S.C. § 102701(a)(2)(B) (emphases added).    Construing  the  facts  in  the  light  most  favorable  to  the Commonwealth, none of these circumstances were present.

First, the officers lacked arrest authority because, at the very least, there is a dispute as to whether Ghaisar was fleeing to *avoid* arrest. Because the shooting occurred outside of the National Park System, Amaya and Vinyard only had authorization to arrest Ghaisar under federal law if Ghaisar was "fleeing . . . *to avoid arrest.*"  54 U.S.C. § 102701(a)(2)(B) (emphasis added).[12]  This provision requires that "a defendant have knowledge that he is being pursued by police and a resultant intention to evade arrest." *United States v. Jones*, 428 F. Supp. 2d 497, 500–01 (W.D. Va. 2006);[13] see also *United States v. LaFountain*, No. 12-po-6164, 2013 WL 391153, at *2–3 (D. Mass. Jan. 29, 2013).

There is no evidence that § 102701's intent requirement was met here.  Indeed, a "reasonable person placed in Mr. Ghaisar's position

_____

[12] See also *United States v. Allen*, No. 17-po-7135, 2018 WL 1035770, at *4 (D. Md. Feb. 23, 2018) (recognizing that Park Police officer "lacked the statutory authority" to arrest the defendant off the Baltimore-Washington Parkway because he was "not fleeing from the officer"); *United States v. Hernandez-Ayala*, No. 16-po-4622, 2017 WL 2666243, at *3 (D. Md. June 21, 2017) (same).

[13] *Jones* discussed 16 U.S.C. § 1a-6(b), Section 102701's predecessor.  The condition that Park Police may only perform warrantless arrests "provided such arrests occur within th[e] [National Park] system or the person to be arrested is fleeing therefrom to avoid arrest" remains substantively unchanged.  428 F. Supp. 2d at 500 (quoting 16 U.S.C. § 1a-6(b)) (emphasis omitted).

would have reasonably been alarmed and/or fearful when Officer Vinyard was paralleling and heading off their vehicle," JA 398 (parenthetical omitted), and "in fear of immediate bodily harm when they observed Officer Amaya approaching their vehicle with a firearm pointed at them," JA 385 (parenthetical omitted). Whether Ghaisar intended to evade arrest or was instead fleeing because he feared for his life is a genuine factual issue that undermines Amaya and Vinyard's statutory authority and defeats their claim to immunity.

Second, there was no "offense against the United States" or "felony cognizable under the laws of the United States." 54 U.S.C. § 102701(a)(2)(B). Leaving the scene of a vehicle collision in violation of Virginia Code § 46.2-894 is a state, not federal, offense. And even if a violation of Virginia law could somehow constitute a felony against the United States, violations of Virginia Code § 46.2-894 are frequently misdemeanors. The accident precipitating the pursuit—where an Uber driver rear-ended Ghaisar's Jeep—did not cause the death of any person and neither Amaya nor Vinyard introduced evidence showing they had reason to conclude the accident caused more than $1,000 of damage to property. See Amaya Motion to Dismiss at 5 (Amaya conceding he "did

not have information" to determine "whether the crime was a felony or misdemeanor offense"). Construing the facts in the light most favorable to the Commonwealth, the officers are not entitled to a presumption that any potential violation of Virginia Code § 46.2-894 was a felony.

       f.    *Vinyard did not have authority to initiate a roadblock.* Vinyard also exceeded his authority by initiating a roadblock without authorization. Park Police policy is clear that "[s]tationary roadblock[s]"—such as the police cruiser Vinyard used here—may be used only as "a last resort" to "close a roadway ahead of a pursuit." JA 260–61 (USPP Gen. Ors. 2210.01 & 2210.03(B)). Furthermore, officers must obtain permission before erecting such a roadblock. JA 260 (USPP Gen. Or. 2210.01). Vinyard, however, never obtained that required permission. See JA 109 at 13:02–07. Vinyard plainly exceeded his authority, both because he neglected to obtain authorization and because he utilized a tool of "last resort" despite ample available alternatives.

      Vinyard also acted contrary to his federal law enforcement training every time he blocked Ghaisar's Jeep. The Department of Homeland Security trains officers to "[p]osition [their] vehicle in-line behind the suspect vehicle," "[o]ffset [their] vehicle to the left of the suspect vehicle,"

or "[a]ngle [their vehicle] toward the center of the road." JA 208. Despite this training, Vinyard instead chose to stop his vehicle *in front* of Ghaisar's Jeep during the second and third stops. JA 109 at 11:53; JA 109 at 13:02–07; see also JA 109 at 10:02–07 (Vinyard stopping his vehicle towards the front of Ghaisar's Jeep during the first stop). Indeed, in the final stop before Amaya and Vinyard killed Ghaisar, Vinyard not only pulled his vehicle in front of Ghaisar's Jeep but angled it so that the passenger side was almost perpendicular to the front of the Jeep. JA 109 at 13:02–07. Vinyard's actions were contrary to FLETC's training directorate, and he is not entitled to Supremacy Clause immunity.

* * *

Merely being federal officers does not exempt Amaya and Vinyard from "criminal liability for what [they] do[] beyond the scope of [their] official duties." *Isaac*, 284 F. at 270. Even if the officers pursued Ghaisar "for an official purpose," to be immune, the act for which they seek immunity "must be done in pursuance of [their] official duty." *Id.* Because they did not have probable cause to arrest Ghaisar for a federal offense, 54 U.S.C. § 102701, or a felony, see Va. Code § 19.2-79, Amaya and Vinyard's actions in chasing, shooting, and killing Ghaisar were not

in pursuance of their official federal duties. *Drury*, 200 U.S. at 8; *Isaac*, 284 F. at 270. At the very least, there is a genuine dispute as to whether the officers exceeded their authority when they took Ghaisar's life. The district court's decision should be reversed.

### 2. Amaya and Vinyard's authority did not extend to violations of the Constitution and to actions taken with criminal intent

Officers necessarily exceed their authority when they violate federal constitutional law or act with a culpable mens rea in violating state criminal law. *Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009) ("[A] federal officer's actions . . . fail to qualify as 'necessary and proper' if committed in violation of the negative injunctions of the Constitution[.]"); *Maryland v. DeShields*, 829 F.2d 1121, at *6 (4th Cir. 1987) (table) ("A federal agent may lose his *Neagle* protection if he acts out of personal interest, malice, or with actual criminal intent."). A violation of either, therefore, dooms Amaya and Vinyard's immunity claim.

1. Amaya and Vinyard exceeded the scope of their federal duties by violating Ghaisar's Fourth Amendment rights. When federal officers act contrary to their constitutional mandate, they are not immune from

state prosecution. *Neagle*, 135 U.S. at 81. A Fourth Amendment violation, therefore, is necessarily fatal to a Supremacy Clause immunity claim.

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV). The Fourth Amendment's "bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019), *cert denied*, 140 S. Ct. 1550 (2020). To determine whether an officer's use of force is excessive, courts apply a "standard of objective reasonableness." *Id.* (quoting *Clem v. Corbeau*, 284 F.3d 543, 549–50 (4th Cir. 2002)).[14] "Because the intrusiveness of a seizure by means of deadly force is unmatched, a police

---

[14] The Fourth Amendment inquiry resembles the second part of the Second Circuit's test in *New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004), which looks at whether the federal official's beliefs were objectively unreasonable. See Section I(B)(2), *infra*. A holding that a federal official violated a victim's Fourth Amendment rights may be *sufficient* to defeat both prongs of the *Neagle* inquiry—because a federal official's actions violating the Fourth Amendment cannot be authorized by federal law and because a federal official's actions violating the Fourth Amendment are, by definition, not objectively reasonable; a holding that a federal official violated a victim's Fourth Amendment rights, however, is not *necessary* to defeat Supremacy Clause immunity.

officer may use deadly force only if the officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* (quoting *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005)) (internal alteration and quotation marks omitted).

Even if Amaya and Vinyard had reason to believe Ghaisar was a fleeing felon,[15] "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The Supreme Court has stressed that when "the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*; see also *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019).

Ghaisar's driving was not erratic, but, at a minimum, whether his driving posed an immediate threat to others is a factual dispute that

---

[15] They did not. Amaya admitted he did not know whether he was pursuing Ghaisar in connection with "a felony or misdemeanor offense." Amaya Motion to Dismiss at 5. Vinyard's counsel summarily claimed that Vinyard was attempting to arrest Ghaisar for "a possible Class 5 felony," but introduced no evidence to support this representation. Vinyard Motion to Dismiss at 6; *United States ex rel. Bradshaw v. Alldredge*, 432 F.2d 1248, 1248 n.1 (3d Cir. 1970) ("[S]tatements by counsel in briefs or in court are not evidence"); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (same).

precludes dismissal. See Section I(B)(1), *infra*. Because Amaya and Vinyard used deadly force against an unarmed person who posed no threat to Amaya, Vinyard, or the public, the officers' conduct violated the Fourth Amendment.

2. Amaya and Vinyard's mens rea also mean they exceeded their federal authority. When officers act "wantonly, with a criminal intent," they cannot also "act[] within the scope of the authority conferred by the laws of the United States." *In re Fair*, 100 F. 149, 155 (C.C.D. Neb. 1900); *Symes*, 286 U.S. at 518; *DeShields*, 829 F.2d at *6.

Amaya and Vinyard were indicted by the special grand jury on two counts: reckless discharge of a firearm in violation of Virginia Code § 18.2-56.1(A1) and involuntary manslaughter in violation of Virginia Code § 18.2-36. JA 22–25. The indictments allege that Amaya and Vinyard "handle[d] a firearm in a manner so gross, wanton, and culpable as to show a reckless disregard for human life." JA 23 (charging Amaya with reckless handling of a firearm in violation of Virginia Code § 18.2-56.1); JA 25 (charging Vinyard with the same). The indictments also alleged that, in handling their firearms in this manner, Amaya and Vinyard "did feloniously kill and slay Bijan Caesar Ghaisar." JA 22

(charging Amaya with involuntary manslaughter in violation of Virginia Code § 18.2-36); JA 24 (charging Vinyard with the same). Under Virginia law, this indictment alleges that the officers discharged their firearms with a "conscious[] disregard of [Ghaisar's] rights," or with "reckless indifference" to the harm that "would probably result." Supreme Ct. of Va. Model Jury Instruction Comm., Virginia Model Jury Instructions – Civil: Release 20 at 36 (Mar. 2020), https://www.vacourts.gov/courts/circuit/resources/model_jury_instructions_civil.pdf (Instruction No. 4.040 defining "willful and wanton" conduct); see also *Sotnikau v. Lynch*, 846 F.3d 731, 736 (4th Cir. 2017).

If Amaya and Vinyard exhibited culpable recklessness using their firearms, this mens rea strips them of Supremacy Clause immunity. At this point, a reasonable factfinder could find that they did act recklessly. Amaya violated Park Police policy when he immediately drew his firearm upon approaching Ghaisar's Jeep, JA 109 at 10:03–05 (first display); JA 109 at 11:54–56 (second display), and when he struck Ghaisar's car with his firearm for no ascertainable reason, JA 109 at 10:06–07; JA 240 (USPP Gen. Or. 3601.02(C)). Amaya's reckless firearm use culminated in his decision to shoot at Ghaisar's Jeep five times, despite the

substantial and unjustified risk to Ghaisar's life and the lives of others in the area. JA 109 at 13:14 (shot one); JA 109 at 13:16–17 (shots two through four); JA 109 at 13:38 (shot five).

For his part, Vinyard acted recklessly when he fired at Ghaisar's Jeep as the car began to roll off the road. JA 109 at 13:38. Even as the Jeep fell, Vinyard fired a final, unnecessary shot. JA 109 at 13:39; JA 472 (suggesting Vinyard's last shots were "as a result of becoming emotionally involved in this incident, perceiving that Mr. Ghaisar was engaging in 'contempt of cop'"). Viewing the evidence in the light most favorable to the Commonwealth and assuming the truth of the allegations in the indictment, *Horiuchi*, 253 F.3d at 367, there is at least a genuine dispute as to whether Amaya and Vinyard acted with sufficiently culpable mens rea.

*   *   *

Because there are genuine issues of fact as to whether Amaya and Vinyard's actions were in pursuance of any federal duty, the district court erred in summarily conferring immunity from state prosecution.

**B.     Amaya and Vinyard are not immune because they failed
to eliminate any genuine dispute that their actions were
no more than necessary and proper in performing their
federal duties**

A federal official is not entitled to Supremacy Clause immunity

unless "he did no more than what was necessary and proper for him to

do." *Neagle*, 135 U.S. at 75.  The Commonwealth's evidence—at the very

least—creates a genuine issue of fact that, by pursuing and killing

Ghaisar, Amaya and Vinyard exceeded what was necessary and proper

to perform their federal duties.

**1.     Amaya and Vinyard's actions exceeded what was
necessary and proper under the *Neagle* test**

With respect to what was proper, Amaya and Vinyard both engaged

in numerous actions that conflicted with Park Police policy and training.

See Section I(A), *supra*.  Surpassing the scope of their statutory and

regulatory authority renders Amaya and Vinyard's actions improper.

See *Horiuchi*, 253 F.3d at 366 n.10 ("There are, of course, numerous ways

a federal officer might abuse his authority . . . For instance, an agent may

not torture a kidnapper to reveal the whereabouts of his victim, even

though he believes it necessary to perform his job.").  As to what was

necessary, the existence of alternatives to killing Ghaisar shows how

Amaya and Vinyard's actions were "more" than what was required.  The

Commonwealth's expert described multiple reasonable alternatives. See JA 397, 413, 430, 442–43, 468, 472.

First, they could have terminated the pursuit upon recognizing that ending the pursuit was the "most prudent course of action." See JA 113 (USPP Gen. Or. 2205.04(A)(4)(b)) (officers may terminate pursuit, especially where "suspect's identity [was] established" and "need for immediate apprehension" was not present). Ghaisar's license plate, "BIJAN," meant his identity was easily established and Ghaisar's driving was not erratic to warrant immediate apprehension. Throughout the dashcam video, Ghaisar's Jeep remained largely within the lines, and Ghaisar drove at a reasonable speed while accounting for other cars' presence on the road. See, *e.g.*, JA 109 at 9:58–10:01; JA 109 at 10:09–11:52; JA 109 at 12:00–13:02; see also JA 109 at 11:44–45 (using indicator before turning right). These actions are not those of a person driving erratically. Indeed, Amaya and Vinyard never alerted dispatch of erratic driving, even though their training and policies required them to do so. JA 114 (USPP Gen. Or. 2205.04(A)(9)(d) providing that "[a]n officer who initiates a pursuit shall immediately notify the Communications Section" of "[a]ny unusual actions of the violator"). That Ghaisar's identity was

known and his driving not erratic rendered unnecessary Amaya and Vinyard's continued pursuit.

Second, Amaya and Vinyard could have allowed the Fairfax County Police Department to use stop sticks to end the encounter. See JA 109 at 12:53–56 (showing Fairfax County Police Department attempting to deploy stop sticks); see also JA 430, 443. In the unlikely event that it became necessary for the pursuit to continue, Amaya and Vinyard could have ceded control to Fairfax County Police Department per Park Police policy or allowed one of the two helicopters circulating the area to follow Ghaisar from the sky. See JA 115 (USPP Gen. Or. 2205.04(B)(4)); JA 430, 442–43. Indeed, at one point, Fairfax's Lieutenant Gohn took the lead, but instead of allowing Lieutenant Gohn to retain the lead, Amaya and Vinyard overtook him. JA 109 at 10:10, JA 109 at 11:17. At a minimum, Vinyard could have complied with Park Police policy and refrained from parking his car immediately in front of Ghaisar's. JA 260 (USPP Gen. Or. 2210.01).

Bijan Ghaisar is dead in part because Amaya and Vinyard chose to ignore safer, alternatives in favor of confronting Ghaisar through dangerous and unnecessary means. Construing the facts in the light

most favorable to the Commonwealth, Amaya and Vinyard's actions exceeded what was necessary and proper. The district court's decision should be reversed.

> ### 2. A reasonable trier of fact could disagree with Amaya and Vinyard's summary assertions that they had a subjective belief that Ghaisar posed a risk to officers or the public, and could find that any such subjective belief was not objectively reasonable

Some courts have reframed *Neagle*'s "necessary and proper" standard into a two-part test resembling qualified immunity: "(1) the actor must subjectively believe that his action is justified; and (2) that belief must be objectively reasonable." *Tanella*, 374 F.3d at 147; *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017), *cert denied* 138 S. Ct. 642 (2018).

1. As an initial matter, this Court should reject *Tanella*'s imputation of the judge-made qualified immunity standard into Supremacy Clause immunity. Nothing in the Supreme Court's framing in *Neagle* suggests that Supremacy Clause immunity boils down to a reasonableness inquiry.

To the contrary, Supremacy Clause immunity resembles conflict preemption, which also derives from the Supremacy Clause. As with

conflict preemption, there must "exist[] a direct conflict between state and federal law" before Supremacy Clause immunity can shield an official from state prosecution. See *Denson*, 574 F.3d at 1348; *id.* at 1347 ("An act cannot simultaneously be necessary to the execution of a duty under the laws of the United States and an offense to the laws of a state."); accord *Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012) (with conflict preemption, "state law is preempted to the extent it actually conflicts with federal law" (quoting *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997)) (internal quotation marks omitted)). The Supreme Court has long admonished that "[u]nless [a] case be of such an exceptional nature, [appellate courts] ought not to encourage the interference of the federal court below with the regular course of justice in the state court." *Baker*, 169 U.S. at 291. To the extent *Tanella*'s reasonableness inquiry shields officials from state prosecution when no direct conflict exists between state and federal law, that approach should be rejected.[16]

---

[16] *Tanella*'s qualified immunity-like standard has also generated confusion. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court rejected the subjective prong of the qualified immunity defense and held that qualified immunity requires only a showing that the official's

2.     In any event, Amaya and Vinyard failed to eliminate any genuine dispute under the *Tanella* test.

a.     Federal officers can support their subjective belief with affidavits, declarations, testimony, and the like.  See, *e.g.*, *Kleinert*, 855 F.3d at 317–18 (officer testified as to subjective belief); *Tanella*, 374 F.3d at 150 (relying on grand jury testimony to demonstrate the officer's subjective belief); *Horiuchi*, 253 F.3d at 368 (citing excerpts from the defendant's testimony).  But Amaya and Vinyard relied exclusively on conclusory statements in their legal briefs.  "[S]tatements by counsel in briefs or in court," however, "are *not* evidence."  *United States ex rel. Bradshaw v. Alldredge*, 432 F.2d 1248, 1248 n.1 (3d Cir. 1970) (emphasis added); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) ("[C]ounsel's statements [a]re not evidence in the case." (internal quotation marks omitted)).  Amaya and Vinyard's failure to substantiate their subjective belief eliminates their Supremacy Clause immunity defense under the *Tanella* test.

---

conduct was objectively reasonable.  *Id.* at 817–18.  Courts have expressed doubt about whether any subjective prong of a Supremacy Clause analysis can survive *Harlow*.  See, *e.g.*, *Horiuchi*, 253 F.3d at 366 n.11; *Livingston*, 443 F.3d at 1222.

In contrast to the officers' summary assertions, the Commonwealth introduced evidence that Amaya and Vinyard pursued and shot Ghaisar, not out of concern that Ghaisar posed a threat to their lives or to the lives of others, but out of anger that Ghaisar defied their orders. See, *e.g.*, JA 301, 303–04, 398, 438, 459. The Commonwealth's expert described the officers' "personalization of the incident" and apparent belief that Ghaisar was refusing to pull over because of his "contempt of cop[s]"; these perceptions led to Amaya and Vinyard shooting at Ghaisar five times because they became "emotionally involved." JA 301, 303–04, 459; JA 438 (explaining that it was "objectively reasonable to consider that Officer Amaya became emotionally involved in this incident and discharged his firearm the third and fourth time at Mr. Ghaisar as a manifestation of his (Officer Amaya's) response to perceived 'contempt of cop' on the part of Mr. Ghaisar").

The Commonwealth's expert highlighted how Amaya's decision to not only hit Ghaisar's Jeep with his firearm but to also kick Ghaisar's Jeep with his foot was conduct "consistent with . . . [a] response to perceived 'contempt of cop.'" JA 303; see also JA 304 (expert report explaining that "a reasonable officer placed in Officer Amaya's position

would not have reasonably believed that striking and/or kicking Mr. Ghaisar's vehicle (which may have been about 3,900 pounds) would have caused Mr. Ghaisar's vehicle to stop"). Likewise, Vinyard's decision to use his police vehicle "(cutting in front of Mr. Ghaisar's vehicle) to force Mr. Ghaisar's vehicle to stop" was "consistent with personalization of the incident (contempt of cop as instructed to Officer Vinyard during his police academy training)." JA 301; JA 398; see also JA 240 (USPP Gen. Or. 3601.02(B): "[f]orce handguns are not effective in disabling or stopping a motor vehicle").

Even if Amaya and Vinyard had provided support for their summary assertions that they believed Ghaisar posed a threat to themselves or the public, the Commonwealth's evidence showing that Amaya and Vinyard emotionally reacted to Ghaisar's perceived "contempt of cop" creates a genuine factual issue as to the officers' subjective beliefs.

b. Even had Amaya and Vinyard offered evidence that they subjectively believed chasing and killing Ghaisar was justified, a reasonable factfinder could find their belief objectively unreasonable, given their training and available alternatives.

*Training and policy*.  The mismatch between Amaya and Vinyard's training and their actions undermine any suggestion that it was objectively reasonable for them to conclude that their actions were justified.  As the Supreme Court explained in the qualified immunity context, "whether it was objectively legally reasonable to conclude that a given [action] was supported by [law] will often require examination of the information possessed by the [acting] officials."  *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  And "it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers . . . they had been warned."  *Gutierrez v. San Antonio*, 139 F.3d 441, 449 (5th Cir. 1998); see also *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training."); *Martin v. Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013); *Drummond ex rel. Drummond v. Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003).

When Amaya joined the Park Police, he learned proper techniques to effectuate a stop and use his firearm.  See JA 132, 149; Amaya Motion to Dismiss at 15 (stating he accumulated "significant experience"

responding to "difficult situations"). Yet, Amaya's response—including his decisions to immediately draw his firearm at each stop, smack the firearm into Ghaisar's Jeep, kick Ghaisar's Jeep, position himself (weapon drawn) close to Ghaisar's Jeep, and shoot at Ghaisar, not once, but five times—is grossly inconsistent with that training and experience.

Vinyard too trained at FLETC and claims he graduated "first in his class." Vinyard Motion to Dismiss at 3. On the day he shot Ghaisar, Vinyard held a current qualification for his issued firearm and had completed refresher training on use of force standards. JA 674. Instead of following his training, Vinyard exercised deadly force, a power reserved for the most extreme circumstances, to arrest an individual suspected of committing a non-violent hit-and-run. Even if Amaya and Vinyard could have believed that their actions were justified, a reasonable trier of fact could conclude that such a belief was not objectively reasonable.

*Numerous alternatives.* The existence of alternative means to apprehend Ghaisar undermines the objective reasonableness of Amaya and Vinyard's asserted subjective belief. See Section I(B)(1), *supra*. First, the officers could have terminated the pursuit on their own because

they knew Ghaisar's identity and because Ghaisar's driving was not dangerous. See JA 113 (USPP Gen. Or. 2205.04(A)(4)(b)); Section I(B)(1), *supra*. Alternatively, Amaya and Vinyard could have allowed the Fairfax County Police Department to continue using stop sticks to deflate Ghaisar's tires. See JA 109 at 12:53–56; see also JA 430, 443. At a minimum, Vinyard could have complied with Park Police policy and refrained from parking his car immediately in front of Ghaisar's. JA 260 (USPP Gen. Or. 2210.01). And finally, Amaya and Vinyard could have ceded control to the Fairfax County per Park Police policy. See JA 115 (USPP Gen. Or. 2205.04(B)(4)); JA 430, 442–43.

Viewing this evidence in the light favorable to the Commonwealth, a reasonable trier of fact could conclude that Amaya and Vinyard's asserted beliefs were not objectively reasonable. *Horiuchi*, 253 F.3d at 367 ("In determining whether material facts are in dispute, the district court must give the non-moving party the benefit of all doubts, both as to the basic facts and the inferences to be drawn from those facts."); *Wyoming v. Livingston*, 443 F.3d 1211, 1226 (10th Cir. 2006); *Tanella*, 374 F.3d at 148. At the very least, these facts support a genuine dispute.

\*     \*     \*

"Supremacy Clause immunity is not absolute and . . . presupposes that federal agents *can* be prosecuted for violating state law." *Horiuchi*, 253 F.3d at 376 (emphasis added). Supremacy Clause immunity is reserved for the "exceptional" case where the propriety of the officer's actions is "beyond dispute." *Id.* at 368; accord *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011). This is no such case. Because a reasonable factfinder could conclude that Amaya and Vinyard's actions exceeded their authority and any subjective belief that their actions were justified was objectively unreasonable, Amaya and Vinyard are not entitled to Supremacy Clause immunity.

### C. The district court ignored genuine factual issues and construed the facts in the light most favorable to Amaya and Vinyard

At the motion to dismiss stage, "the district court may grant the motion only if the facts supporting the immunity claim are not in dispute." *Horiuchi*, 253 F.3d at 367; *Weaver*, 659 F.3d at 355 n.* (4th Cir. 2011) ("[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts."). The evidence is viewed in the light most

favorable to the non-moving party. *Horiuchi*, 253 F.3d at 367; *Tanella*, 374 F.3d at 148; *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988).

The district court ignored this standard and instead summarily rewrote the facts to support Amaya and Vinyard's version of events. Here are seven of the factual issues the district court ignored:

1. *Instructions from dispatch and superiors.* The court contended, without citation, that Amaya and Vinyard "were instructed by dispatch to pursue Ghaisar." JA 880; JA 888. Dispatch gave no such instruction. Dispatch instead merely asked, "Are you in pursuit of this vehicle?" JA 109 at 8:22–24. Amaya and Ghaisar's superiors' failure to instruct them to terminate the pursuit, JA 880; JA 888, is likewise irrelevant. Officers are not permitted to outsource their decision-making to others, including dispatch and their superior officers, and must decide for themselves whether to pursue someone. JA 112–13 (USPP Gen. Or. 2205.04(A)(2)).

2. *Ghaisar's driving.* Ghaisar did not "nearly caus[e] a collision," as the district court contended. JA 881; JA 889. The dashcam video instead shows Ghaisar driving at a reasonable speed while avoiding other cars on the road. See, *e.g.*, JA 109 at 9:53–10:01; JA 109 at 10:09–11:52;

JA 109 at 12:00–13:02. To the extent that there is any question about Ghaisar's driving, this factual question precludes dismissal.

3. *Whether Amaya and Vinyard believed Ghaisar was driving under the influence.* Park Police officers must inform dispatch if they suspect someone of driving dangerously or under the influence. JA 114 (USPP Gen. Or. 2205.04(A)(9)(d) providing that "[a]n officer who initiates a pursuit shall immediately notify the Communications Section" of "[a]ny unusual actions of the violator"). At no point during the chase did Amaya or Vinyard raise this purported concern. But even though "statements by counsel in briefs or in court are not evidence," *Bradshaw*, 432 F.2d at 1248 n.1, the district court blindly accepted counsel's word, concluding with no evidence that "both officers believed Ghaisar was under the influence of drugs or alcohol and a danger on the road," JA 881; JA 889. Whether Amaya and Vinyard believed Ghaisar was under the influence is, at best, a factual issue. See *Horiuchi*, 253 F.3d at 366 n.11. The district court's decision to resolve this factual dispute in Amaya and Vinyard's favor is reversible error.

4. *Where Vinyard stopped his cruiser.* The dashcam video shows that Vinyard stopped his vehicle in front of Ghaisar's Jeep during the

second and third stops and towards the front during the first stop. JA 109 at 11:51–53; JA 109 at 13:02–07; JA 109 at 10:02–07 (first stop). The district court nevertheless stated that Vinyard "eventually pulled *alongside* Ghaisar" during the first stop, JA 881 (emphasis added); JA 889 (emphasis added), and that Vinyard merely "pulled Ghaisar over" during the second, JA 881; JA 889. There is no question that Vinyard stopped his car directly in front of Ghaisar's Jeep contrary to his training. See JA 208; JA 109 at 11:51–53, 13:02–07. The district court did not merely construe the facts in the light most favorable to the *moving parties*, but instead rewrote the facts.

5. *Whether Ghaisar's Jeep inched towards or away from Amaya.* During the final stop, Amaya exited the vehicle with his gun drawn and stood towards the left of Ghaisar's Jeep. JA 109 at 13:10–13. The Jeep moved. JA 109 at 13:14. The district court stated that "Ghaisar's Jeep lurched forward toward Officer Amaya." JA 882; JA 890. But the dashcam video unambiguously shows Ghaisar's Jeep inching to the right, *away* from Amaya. JA 109 at 13:14. The district court's conclusory representation to the contrary upends the motion-to-dismiss standard.

6. *Amaya and Vinyard's subjective belief.* The Commonwealth introduced evidence that Amaya and Vinyard shot Ghaisar, not because they believed he posed an imminent threat, but because they personalized the incident and believed Ghaisar had "contempt of cop[s]." See JA 301, 303–04. Instead of addressing this dispute, the district court stated without explanation or citation that Amaya fired his weapon at Ghaisar because Amaya "[f]ear[ed] for his life." JA 882; JA 890. This conclusory statement ignores the reality that the Commonwealth need only raise a genuine factual issue. *Livingston*, 443 F.3d at 1226.

7. *Omissions.* Also notable is what the court chose to exclude. There is no discussion of how Amaya and Vinyard's actions were inconsistent with both federal law and Park Police policy. See Section I(A), *supra*. Nor was there any discussion of the evidence the Commonwealth submitted that conflicted with the summary assertions of Amaya and Vinyard's counsel. The district court's retelling of Ghaisar's death obfuscates Amaya and Vinyard's repeated violations Park Police policy.

At the motion to dismiss stage, the evidence is viewed in the light most favorable to the non-moving party. *Horiuchi*, 253 F.3d at 367. That

is not what happened here. The district court's willful blindness to the myriad of factual disputes and the court's recasting in the light most favorable to Amaya and Vinyard merit reversal.

## II. These state prosecutions should be remanded to state court because Amaya and Vinyard's failure to raise a colorable federal defense meant that the district court did not have jurisdiction

This Court should reverse the district court's decision to assume jurisdiction for the same reason it should reverse the court's decision to dismiss the indictments—Amaya and Vinyard are not entitled to Supremacy Clause immunity.

The federal officer removal statute, 28 U.S.C. § 1442, provides a limited exception to the "strong judicial policy against federal interference with state criminal proceedings." *Manypenny*, 451 U.S. at 243 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 600 (1975)). Under this limited exception, a "criminal prosecution that is commenced in a State court . . . may be removed" to federal court if the prosecution is against "any officer . . . of the United States . . . for or relating to any act under color of such office or on account of any . . . authority claimed under any Act of Congress for the apprehension or punishment of criminals." 28 U.S.C. § 1442(a)(1). Federal officers seeking to enter federal court

must also raise a "colorable federal defense" arising out of their duty to enforce federal law. See *Mesa v. California*, 489 U.S. 121, 129 (1989). The "burden of demonstrating jurisdiction resides with the party seeking removal." *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc) (quoting *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994)) (internal quotation marks omitted).

The only federal defense Amaya and Vinyard assert is Supremacy Clause immunity. Both, however, failed to plead a defense sufficient to justify removal. Amaya and Vinyard's notices of removal contained only bald assertions that they believed they acted with authority. See, *e.g.*, JA 29 ("Therefore, this Defendant has a well-grounded basis for a federal officer immunity defense under the Supremacy Clause, which is more than sufficient to establish grounds for federal officer removal."); JA 58 ("Vinyard reasonably believed that his actions were justified in carrying out his federal duties."). Their failure to allege any facts to support the scope of their purported authority or the reasonableness of their beliefs requires that this matter be remanded to the Virginia state court.

Vinyard also failed to satisfy the removal statute's procedural requirements. Section 1455 requires that removing defendants file in the

district court: (1) a notice of removal; (2) a short and plain statement of the grounds for removal; and (3) a copy of all process, pleadings, and orders served upon the defendant. 28 U.S.C. § 1455(a). Vinyard failed to attach the bench warrant served on him by the special grand jury. Ex. 1 to the Commonwealth's Response to Defendant's Notice of Removal, *Commonwealth of Virginia v. Vinyard*, No. 1:20-cv-1396 (E.D. Va. April 8, 2021), ECF No. 17. Vinyard's failure to meet the bare procedural requirements of Section 1455 means he did not properly invoke the district court's jurisdiction.

Amaya and Vinyard's failure to raise a colorable federal defense and Vinyard's failure to comply with procedural requirements mean they did not properly invoke federal jurisdiction. This Court should vacate the district court's decisions and remand this matter to the Circuit Court for Fairfax County.

## CONCLUSION

This matter should be remanded to the Circuit Court for Fairfax County. In the alternative, the district court's October 22, 2021 decisions should be reversed and this matter remanded for further proceedings.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA,

By: _____*/s/ Michelle S. Kallen*_____
          MICHELLE S. KALLEN
          *Solicitor General*

MARK R. HERRING
  *Attorney General*

ERIN B. ASHWELL
  *Chief Deputy Attorney General*

STEVE T. DESCANO
  *Commonwealth's Attorney for*
  *Fairfax County*

KYLE MANIKAS
  *Chief Deputy Commonwealth's*
  *Attorney*

BRITTANY M. JONES
A. ANNE LLOYD
  *Deputy Solicitors General*

ROHINIYURIE TASHIMA
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

*Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Commonwealth of Virginia believes that oral argument may aid in the decisional process in this case.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,628 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.

*/s/ Michelle S. Kallen*
Michelle S. Kallen

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2022, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Michelle S. Kallen*
Michelle S. Kallen