Nos. 21-4584(L), 21-4589

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————————

COMMONWEALTH OF VIRGINIA,
Appellant,

v.

ALEJANDARO AMAYA,
Appellee,

and

COMMONWEALTH OF VIRGINIA,
Appellant,

v.

LUCAS VINYARD,
Appellee.

———————————————

ON APPEALS FROM JUDGMENTS OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

———————————————

**BRIEF FOR THE DISTRICT OF COLUMBIA AND THE STATES OF
ILLINOIS, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA,
NEVADA, OREGON, VERMONT, AND WASHINGTON AS AMICI
CURIAE IN SUPPORT OF APPELLANT**

———————————————

KARL A. RACINE
Attorney General for the
District of Columbia

LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Principal Deputy Solicitor General

ASHWIN P. PHATAK
Deputy Solicitor General

ADAM J. TUETKEN
Assistant Attorney General

Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-6287
(202) 730-1864 (fax)
Loren.AliKhan@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI ................................................... 1

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ............................................................................. 4

    I.    Any Standard For Supremacy Clause Immunity Should Respect States' Powers And Responsibilities Over Criminal Law .................. 4

        A.    States have historic, preeminent powers to enforce criminal law that courts should be careful not to restrain .......... 4

        B.    This Court should avoid importing principles from civil immunities because that approach does not adequately respect state sovereignty ........................................................ 7

        C.    This Court should avoid approaches that do not foster respect for the rule of law ....................................................... 11

    II.    This Court Should Clarify The Standard For Granting Supremacy Clause Immunity ............................................................ 16

        A.    Under *Neagle*'s first prong, courts should carefully enforce limits on federal authority ........................................... 16

        B.    *Neagle*'s second prong should require a substantial showing of necessity and constitutionality ............................. 21

            1.    The standard under the second prong must be higher than bare reasonableness ................................................ 21

            2.    Violating the Constitution exceeds what is "necessary and proper" .................................................. 24

CONCLUSION ......................................................................... 26

# TABLE OF AUTHORITIES

*Cases*

*Anderson v. Creighton*, 483 U.S. 635 (1987) ........................................................ 8, 9

*Arizona v. Files*, 36 F. Supp. 3d 873 (D. Ariz. 2014) ................................................ 2

*Arizona v. Manypenny*, 451 U.S. 232 (1981) ................................................ 1, 5, 6

*Baker v. Grice*, 169 U.S. 284 (1898) ................................................ 6, 7, 8

*Battle v. State*, 258 A.3d 1009 (Md. Ct. Spec. App. 2021) ............................. 18, 20

*Birsch v. Tumbleson*, 31 F.2d 811 (4th Cir. 1929) .................................. 2, 6, 16, 24

*Bond v. United States*, 572 U.S. 844 (2014) ........................................................ 4, 20

*Butz v. Economou*, 438 U.S. 478 (1978)........................................................ 15, 18, 25

*Castle v. Lewis*, 254 F. 917 (8th Cir. 1918) .............................................................. 6

*City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021)........................................................ 9

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821) ................................................. 4

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)............................................. 8

*Couture v. Commonwealth*, 656 S.E.2d 425 (Va. Ct. App. 2008)........................ 10

*Cunningham v. Neagle*, 135 U.S. 1 (1890)....................... 2, 7, 9, 16, 19, 21, 22, 23

*Denson v. United States*, 574 F.3d 1318 (11th Cir. 2009)..................................... 25

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) ............................................ 9

*Engle v. Isaac*, 456 U.S. 107 (1982)......................................................................... 1

*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949) ................................................. 11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)............................................................... 5

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)....................................................... 9, 10

*Heath v. Alabama*, 474 U.S. 82 (1985)................................................................ 4, 10

*Hernandez v. Mesa*, 140 S. Ct. 735 (2020)............................................................. 15

*Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001)........................................ 7, 24, 25

*Imbler v. Pachtman*, 424 U.S. 409 (1976)................................................................ 7

*In re Winship*, 397 U.S. 358 (1970)....................................................................... 10

*Kolibash v. Comm. on Legal Ethics of the W. Va. Bar*,
    872 F.2d 571 (4th Cir. 1989) ............................................................................ 10

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) ............... 9

*Mesa v. California*, 489 U.S. 121 (1989) ..................................................... 2, 5, 19

*New York v. De Vecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007) .......................... 23

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004)................................................. 6

*North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991) ....................... 2, 22, 23

*North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990) ................... 2, 11, 18, 20, 22

*Olmstead v. United States*, 277 U.S. 438 (1928).................................................... 11

*Oregon v. Ice*, 555 U.S. 160 (2009)........................................................................ 1

*Patterson v. New York*, 432 U.S. 197 (1977)....................................................... 5, 8

*Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) ................................................. 5

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) .................................... 12

*Smith v. Ray*, 781 F.3d 95 (4th Cir. 2015) ............................................................ 25

*State v. Deedy*, 407 P.3d 164 (Haw. 2017)..................................................... 18, 20

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) .............. 8

*Tennessee v. Davis*, 100 U.S. 257 (1879)......................................................... 7, 19

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) ....................................................... 7

*Torres v. Lynch*, 578 U.S. 452 (2016) ............................................................... 1, 15

*United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906) ...... 5, 6, 7, 8, 16, 18, 19, 20

*United States v. Archer*, 486 F.2d 670 (2d Cir. 1973) ........................................... 11

*United States v. Crittendon*, 883 F.2d 326 (4th Cir. 1989).................................... 24

*United States v. Cruikshank*, 92 U.S. 542 (1875) .................................................. 4

*United States v. Fuller*, 162 F.3d 256 (4th Cir. 1998) ........................................... 9

*Virginia v. Amaya*, No. 1:21-cr-91, 2021 WL 4942808
   (E.D. Va. Oct. 22, 2021)................................................................... 17, 20, 21

*Virginia v. Vinyard*, No. 1:21-cr-92, 2021 WL 4942807
   (E.D. Va. Oct. 22, 2021)................................................................................ 17

*West Virginia v. Laing*, 133 F. 887 (4th Cir. 1904) ............................................... 24

*Will v. Hallock*, 546 U.S. 345 (2006) ................................................................... 9

*Wood v. Georgia*, 370 U.S. 375 (1962) ................................................................ 10

*Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006) ........................ 6, 7, 21, 23

## Constitutional Provisions

U.S. Const. amend. V ............................................................................... 10

U.S. Const. amend. VI .............................................................................. 10

U.S. Const. amend. X ................................................................................. 4

U.S. Const. art. I, § 8, cl. 18 ................................................................... 21

U.S. Const. art. VI, cl. 2.............................................................................. 1

## Statutes and Regulations

18 U.S.C. § 242 ................................................................................ 15

18 U.S.C. § 1112 .............................................................................. 15

28 U.S.C. § 1442 ................................................................................ 6

28 U.S.C. § 2680 .............................................................................. 15

54 U.S.C. § 102701(a)(2) ................................................................ 17

54 U.S.C. § 102701(a)(2)(B) .......................................................... 20

## Other

1 Wayne R. LaFave, *Substantive Criminal Law* § 2.1(c) (3d ed. 2021) .................. 9

166 Cong. Rec. S1713 (daily ed. Mar. 12, 2020) (statement of
   Sen. Grassley) ............................................................................ 13

Josh Bowers & Paul H. Robinson, *Perceptions of Fairness and Justice: The
   Shared Aims and Occasional Conflicts of Legitimacy and Moral
   Credibility*, 47 Wake Forest L. Rev. 211 (2012) .............................. 12

Editorial Bd., *Opinion: In the Bijan Ghaisar Case, the Police Get Away With
   It*, Wash. Post (Oct. 24, 2021, 8:00 a.m.) ......................................... 14

Editorial Bd., *Opinion: It's Hard to Hold Police Accountable. For Federal
   Agents, It's All but Impossible*, Wash. Post (Sept. 22, 2021, 1:04 p.m.) ........... 14

Editorial Bd., *Opinion: Justice for Bijan Ghaisar Has Been Delayed—But
   Not Yet Denied*, Wash. Post (May 4, 2021, 9:00 a.m.) .................................. 13

Editorial Bd., *Why Did Park Police Officers Kill Bijan Ghaisar?*,
   Wash. Post (Sept. 26, 2019) ............................................................. 13

Fed. R. App. P. 29(a)(2) ..................................................................... 1

Tom Jackman, *Judge Dismisses Criminal Charges Against Park Police
   Officers in Bijan Ghaisar Slaying*, Wash. Post (Oct. 22, 2021, 4:25 p.m.) ....... 14

Tom Jackman, *Manslaughter Case in Park Police Killing of Bijan Ghaisar Moves to Federal Court*, Wash. Post (Apr. 23, 2021, 6:18 p.m.) ...................... 14

Taryn A. Merkl, *Protecting Against Police Brutality and Official Misconduct: A New Federal Criminal Civil Rights Framework*, Brennan Ctr. for Just. (Apr. 29, 2021) .............................................. 15

Pew Res. Ctr., *Why Americans Don't Fully Trust Many Who Hold Positions of Power and Responsibility* (Sept. 19, 2019) .................................... 13

John Samples & Emily Ekins, *Public Attitudes Toward Federalism: The Public's Preference for Renewed Federalism*, Cato Inst. (2014) ...................... 12

Saundra K. Schneider & William G. Jacoby, *Public Attitudes Toward the Policy Responsibilities of the National and State Governments: Evidence From South Carolina*, 3 State Pol. & Pol'y Q. 246 (2003) .............................. 12

Sen. Mark R. Warner, Press Release, *Sen. Warner on Fairfax Commonwealth's Attorney Charges Against the U.S. Park Police Officers Involved in the 2017 Shooting Death of Bijan Ghaisar* (Oct. 16, 2020) ........... 14

Sen. Mark R. Warner, Press Release, *Statement of U.S. Sen. Mark R. Warner on Dismissal of All Criminal Charges Against the Two U.S. Park Police Officers Involved in the 2017 Shooting Death of Bijan Ghaisar* (Oct. 22, 2021) ................................................................................ 14

Sens. Mark R. Warner & Chuck Grassley, Press Release, *Statement of U.S. Sens. Mark R. Warner and Chuck Grassley on the Decision by the Department of Justice Not to Pursue Charges Against the Officers Who Shot and Killed Bijan Ghaisar* (Nov. 14, 2019) ............................................... 13

Reps. Jennifer Wexton & Don Beyer & Congresswoman Eleanor Holmes Norton, Press Release, *Joint Statement on Charges Filed Against U.S. Park Police Officers in the Killing of Bijan Ghaisar* (Oct. 15, 2020) .............. 13

## INTRODUCTION AND INTEREST OF AMICI

The District of Columbia and the States of Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, Oregon, Vermont, and Washington (collectively, the "Amici States") submit this brief as amici curiae in support of appellant, the Commonwealth of Virginia. *See* Fed. R. App. P. 29(a)(2). The Supreme Court has described states' power over criminal law as "plenary," "primary," and "pre-eminent[]." *Torres v. Lynch*, 578 U.S. 452, 458 (2016); *Engle v. Isaac*, 456 U.S. 107, 128 (1982); *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981). Virginia sought to exercise that power here when it criminally charged two federal Park Police officers for fatally shooting an unarmed driver of a vehicle they pursued into Virginia. But Virginia was thwarted by the lower court's mistaken, magnified view of immunity for federal employees under the Supremacy Clause. U.S. Const. art. VI, cl. 2. That decision strikes "at the core of" a sister State's "sovereign status," *Oregon v. Ice*, 555 U.S. 160, 170 (2009), and it disrupts the careful balance between state and federal authority that undergirds our system of government.

This Court should reverse that decision and clarify the standard for applying Supremacy Clause immunity to avoid usurping states' plenary power over criminal law. Over a century ago, the Supreme Court held that a federal officer is immune only (1) "for an act which he was authorized to do by the law of the United States, which it was his duty to do as [an officer] of the United States," and (2) "if, in doing

that act, he did no more than what was necessary and proper for him to do." *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890). Further, while this Court has seldom addressed Supremacy Clause immunity, when doing so, it has carefully enforced its limits. *See North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991); *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990); *Birsch v. Tumbleson*, 31 F.2d 811 (4th Cir. 1929). This Court should take this opportunity to articulate a precise standard that respects states' criminal-law powers by requiring a sufficiently high showing before shielding federal officers from state prosecutions.

To be clear, the Amici States value the important role of federal officers, especially law enforcement, in our federalist system. But in this case, a sister State made the weighty decision that two individuals, despite their federal jobs, engaged in criminal conduct and must be held accountable. That decision deserves respect. Moreover, how this Court decides this case will affect not just these employees and offenses, but all manner of federal employees, from truck drivers to postal workers, *see Ivory*, 906 F.2d at 1000; *Mesa v. California*, 489 U.S. 121, 123 (1989), and all manner of state-law offenses, from traffic violations to animal cruelty, *see Cisneros*, 947 F.2d at 1138; *Arizona v. Files*, 36 F. Supp. 3d 873, 875-76 (D. Ariz. 2014). Given these wide-ranging consequences, this Court should carefully limit the boundaries of Supremacy Clause immunity to respect state sovereignty and foster respect for the rule of law.

2

## SUMMARY OF ARGUMENT

1. Any standard for Supremacy Clause immunity should respect states' powers and responsibilities over criminal law. Our constitutional system assigns responsibility for criminal law primarily to the states—a responsibility which, the Supreme Court has cautioned, federal courts should not undercut. Yet lower courts too often exaggerate Supremacy Clause immunity with standards grafted from inapt, non-constitutional civil immunities. This Court should reject that approach because it fails to respect state sovereignty over criminal law and fails to foster respect for the rule of law.

2. This Court should impose two requirements derived from Supreme Court precedent before granting Supremacy Clause immunity. First, courts should pay close attention to the precise limits on federal officers' authority, as contained in statutes, regulations, and policies, when considering whether an officer was authorized to act. When the text of those sources outlines limits to federal authority, courts should enforce those limits. Second, when federal officers exercise their authority, their criminal acts should enjoy immunity only if truly necessary and proper to performing their duties. Moreover, violating the Constitution should never be considered necessary to perform job duties. Requiring this two-prong showing properly balances federal officers' flexibility to carry out their responsibilities while ensuring that states can evenhandedly enforce their criminal laws.

**ARGUMENT**

**I.    Any Standard For Supremacy Clause Immunity Should Respect States' Powers And Responsibilities Over Criminal Law.**

The Supreme Court has made clear that states generally retain the responsibility for enforcing criminal laws, and federal courts should rarely curtail that power. Yet lower courts often exaggerate Supremacy Clause immunity and, in doing so, misunderstand the Court's precedents and the nature of such immunity. This Court should avoid approaches that do not adequately respect state sovereignty or ensure respect for and trust in the rule of law.

> **A.    States have historic, preeminent powers to enforce criminal law that courts should be careful not to restrain.**

Even before the Constitution was ratified, states enjoyed "powers to undertake criminal prosecutions." *Heath v. Alabama*, 474 U.S. 82, 89 (1985). Although the Constitution altered state power in some ways, it left many "prerogatives of sovereignty" with the states, "[f]oremost among" them "the power to create and enforce a criminal code." *Id.* at 93. Indeed, since the states "entered into the Union," their "very highest duty" has been "to protect all persons within their boundaries." *United States v. Cruikshank*, 92 U.S. 542, 553 (1875). While the Constitution also gives "limited powers" to the federal government, *Bond v. United States*, 572 U.S. 844, 854 (2014), those powers do not include a police power to "punish felonies generally," *id.* (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 428 (1821)). Instead, the Constitution, implicitly in its structure and explicitly by the Tenth

Amendment—which "reserve[s] to the States" "powers not delegated to the United States"—protects the states' interest in undertaking criminal prosecutions. *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016). Thus, "the business" of criminal law remains with the states. *Patterson v. New York*, 432 U.S. 197, 201 (1977).

To be sure, when the federal government "act[s] within" the confines of its limited powers, the Supremacy Clause provides that "Congress may impose its will on the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). But given how "extraordinary" this power is "in a federalist system," it is "a power that [courts] must assume Congress does not exercise lightly." *Id.* As a result, and "[b]ecause the regulation of crime is pre-eminently a matter for the States," there is "a strong judicial policy against federal interference with state criminal proceedings." *Mesa*, 489 U.S. at 138 (quoting *Manypenny*, 451 U.S. at 243). That "strong judicial policy" has particular force when defendants in state prosecutions claim immunity under the Supremacy Clause. *Id.* Although federal courts may grant such immunity, the Supreme Court has cautioned that this is "an exceedingly delicate jurisdiction" because "the decision of a single judge of the Federal court" may "finally prevent[]" the trial of someone "subject to [a state's] laws." *United States ex rel. Drury v.*

*Lewis*, 200 U.S. 1, 7 (1906) (quoting *Baker v. Grice*, 169 U.S. 284, 291 (1898)).[1] Thus, cases warranting immunity require an "exceptional nature," *id.*, and federal courts must maintain "the highest regard" for state prosecutions that come before them, *Manypenny*, 451 U.S. at 243.

Given states' broad powers over criminal law and the limited role for Supremacy Clause immunity, any standard for imposing immunity must respect the interests of state sovereignty. If a standard is too low, too many defendants will escape prosecution for criminal acts only loosely related to their federal duties. Rather, the standard should save immunity for those cases where "failure" to impose it would "*seriously* interfer[e] with the enforcement of the laws of the United States or the operation of its government." *Birsch*, 31 F.2d at 813 (emphasis added) (citing *Castle v. Lewis*, 254 F. 917, 921 (8th Cir. 1918)).

---

[1]     Early cases on Supremacy Clause immunity arose after federal employees charged in state court petitioned federal courts for a writ of habeas corpus. *E.g.*, *Drury*, 200 U.S. at 2; *Baker*, 169 U.S. at 290-91; *Birsch*, 31 F.2d at 812. Now, the issue of Supremacy Clause immunity often arises when, as here, federal defendants remove state prosecutions to federal court under 28 U.S.C. § 1442. *See Wyoming v. Livingston*, 443 F.3d 1211, 1222-24 (10th Cir. 2006). Nonetheless, the same substantive standard for immunity applies. *See, e.g.*, *id.*; *New York v. Tanella*, 374 F.3d 141, 149 n.1 (2d Cir. 2004).

**B.    This Court should avoid importing principles from civil immunities because that approach does not adequately respect state sovereignty.**

As explained, the Supreme Court has warned that federal courts should grant immunity only in "extraordinary" circumstances. *Drury*, 200 U.S. at 7 (quoting *Baker*, 169 U.S. at 291). Nevertheless, some lower courts have too readily granted Supremacy Clause immunity. *See, e.g.*, *Texas v. Kleinert*, 855 F.3d 305, 314-15 (5th Cir. 2017) (granting immunity where a defendant believed that his "actions were appropriate" and his belief was "reasonable"). Many of these decisions improperly imported standards from civil immunities, particularly qualified immunity. *See, e.g.*, *Wyoming v. Livingston*, 443 F.3d 1211, 1221-22 (10th Cir. 2006); *Idaho v. Horiuchi*, 253 F.3d 359, 389 (9th Cir.) (en banc) (Hawkins, J., dissenting), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001) (en banc). However, the Supreme Court "has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law." *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976). Indeed, these decisions overlook key differences between civil immunities and Supremacy Clause immunity.

The most fundamental difference is that Supremacy Clause immunity derives from the Constitution, *see Neagle*, 135 U.S. at 61-62; *Tennessee v. Davis*, 100 U.S. 257, 263 (1879), while qualified immunity began as a gloss on common-law tort immunities, *Imbler*, 424 U.S. at 421, and has since been "completely reformulated"

into "an objective inquiry into the legal reasonableness of the official action," *Anderson v. Creighton*, 483 U.S. 635, 645 (1987). Because Supremacy Clause immunity is a constitutional doctrine, common-law tort rules are inapt. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (rejecting the use of common-law tort principles to govern constitutional liability for due process claims). Rather, in interpreting and applying a constitutional doctrine, this Court should follow the standard sources of constitutional interpretation: text, history, structure, and the Supreme Court's past interpretations. *See generally Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462-70 (2019) (interpreting the Twenty-First Amendment by examining text, history, structure, and past interpretations).

Although the text of the Supremacy Clause sheds little light on its meaning here, other sources indicate substantial differences between Supremacy Clause immunity and civil immunities. For instance, while the history and structure of the Constitution demand that courts avoid interference into state prosecutions, *see Patterson*, 432 U.S. at 201-02, a strongly protective immunity like qualified immunity may often quash states' attempts to enforce their criminal laws. Likewise, the Supreme Court's precedents on Supremacy Clause immunity speak in very different terms than the Court's precedents on qualified immunity. While Supremacy Clause immunity should apply only in "extraordinary" circumstances, *e.g.*, *Drury*, 200 U.S. at 7 (quoting *Baker*, 169 U.S. at 291), "qualified immunity

8

protects 'all but the plainly incompetent or those who knowingly violate the law,'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). Notably, the Supreme Court articulated a standard for Supremacy Clause immunity long before the Court formulated its modern approach to qualified immunity, so it makes little sense to import the latter standard into the former. *Compare Neagle*, 135 U.S. at 75, *with Anderson*, 483 U.S. at 645.

Moreover, Supremacy Clause immunity and qualified immunity arise in different contexts, with different functions, and thus require different standards. Qualified immunity is designed to prevent liability when persons act "reasonably in the face of" constitutional law that may be unclear. *Will v. Hallock*, 546 U.S. 345, 352 (2006). But constitutional law differs from criminal law, which (1) is mostly statutory, 1 Wayne R. LaFave, *Substantive Criminal Law* § 2.1(c) (3d ed. 2021); (2) must be clear to have effect, *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272-73 (4th Cir. 2019) (en banc); and (3) is presumed to be known by everyone, *United States v. Fuller*, 162 F.3d 256, 262 (4th Cir. 1998). There is therefore no similar lack of clarity or fair warning with state criminal laws such that federal officers should generally avoid liability if they violate them.

Further, qualified immunity is designed to protect civil defendants from "insubstantial claims." *Harlow v. Fitzgerald*, 457 U.S. 800, 813-14 (1982). But

"[c]ivil proceedings, of course, are not subject to the checks which normally attend the criminal process." *Kolibash v. Comm. on Legal Ethics of the W. Va. Bar*, 872 F.2d 571, 576 (4th Cir. 1989). This is true in a few ways: (1) civil proceedings "may be instituted at the behest of a single individual," *id.*, while criminal prosecutions are brought by the state government, thus demanding respect, *Heath*, 474 U.S. at 93, and often, as in this case, commence following a grand jury's consideration of evidence, which supplies "primary security to the innocent against hasty, malicious and oppressive persecution," *Wood v. Georgia*, 370 U.S. 375, 390 (1962); (2) the standard of proof is much higher in criminal cases, *In re Winship*, 397 U.S. 358, 367-68 (1970); (3) the Constitution textually provides procedural protections in criminal cases, *see, e.g.*, U.S. Const. amends. V, VI; *Kolibash*, 872 F.2d at 576; and (4) criminal law has its own body of defenses, *see, e.g.*, *Couture v. Commonwealth*, 656 S.E.2d 425, 431 (Va. Ct. App. 2008) (applying necessity defense in case involving deadly shooting by a police officer). Given these "checks," *Kolibash*, 872 F.2d at 576, a standard resembling qualified immunity is unnecessary in the criminal context. In other words, the comparative difficulty in bringing and proving criminal charges versus a civil claim means that the prospect of a criminal case should not chill a federal officer in the way the prospect of a civil case would. *See Harlow*, 457 U.S. at 814 (noting that qualified immunity seeks to avoid scenarios where officers

are chilled in performing their duties out of fear of later being sued (citing *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949))).

In short, although some lower courts have improperly transplanted civil immunities into the Supremacy Clause context, that approach is unmoored from Supreme Court precedent and too often strips states of their plenary criminal-law powers. This Court should not follow that course.

### C. This Court should avoid approaches that do not foster respect for the rule of law.

Adopting an insufficiently stringent standard for applying Supremacy Clause immunity could also prevent states from evenhandedly enforcing their criminal laws when crimes are committed within their boundaries. That threatens the rule of law in multiple ways.

First, laws "depend for effect on universal observance," yet an immunity that is too strong creates "a judicially conceived hierarchy of" citizens in which some, by virtue of their federal job, can violate the law. *Ivory*, 906 F.2d at 1003. As Justice Brandeis famously cautioned, "[i]f the government becomes a lawbreaker, it breeds contempt for law." *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting); *accord United States v. Archer*, 486 F.2d 670, 673-77 (2d Cir. 1973) (Friendly, J.) (relying on Justice Brandeis' opinion in condemning a "scheme" by federal agents "which involved lying to New York police officers and perjury before New York judges and grand jurors"). To that end, the Amici States' employees,

11

including law enforcement officers, must abide by criminal laws and the Constitution. Except in exceptional circumstances, so should federal employees.

Second, a broad immunity threatens states' ability and legitimacy to serve justice in the eyes of the public. The rule of law depends on the public's perception of the criminal justice system as a fair one that actually serves justice. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) (explaining that "the public legitimacy of our justice system relies on procedures that are 'neutral, accurate, consistent, trustworthy, and fair'" (quoting Josh Bowers & Paul H. Robinson, *Perceptions of Fairness and Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility*, 47 Wake Forest L. Rev. 211, 215-16 (2012))); Bowers & Robinson, *supra*, at 213-14, 216. In the public's eyes, the responsibility for criminal justice resides with the states. *See* Saundra K. Schneider & William G. Jacoby, *Public Attitudes Toward the Policy Responsibilities of the National and State Governments: Evidence From South Carolina*, 3 State Pol. & Pol'y Q. 246, 261 (2003) (reporting survey results that 53.7% of respondents said states should be responsible for crime versus 34% who said the federal government); John Samples & Emily Ekins, *Public Attitudes Toward Federalism: The Public's Preference for Renewed Federalism* 31, Cato Inst. (2014) (reporting survey results that 73% of respondents said states should be responsible for law enforcement versus 20% who

said the federal government).[2]  Thus, when states prosecute those who violate the law when performing official duties, they help restore confidence in the public that they can serve justice equally.  *Cf.* Pew Res. Ctr., *Why Americans Don't Fully Trust Many Who Hold Positions of Power and Responsibility* (Sept. 19, 2019) (reporting survey results showing a crisis of confidence in public officials and that respondents do not believe unethical behavior results in serious consequences).[3]

But when state prosecutions run into the roadblock of Supremacy Clause immunity, public perception of states' ability to evenhandedly enforce the law suffers.  Consider this case.  The shooting at issue, and the federal government's refusal to hold the officers accountable, sparked widespread and bipartisan outrage—from editorial boards to the floor of the United States Senate.[4]  Virginia's decision to pursue charges, however, received public praise for its potential to finally bring justice.[5]  When that prosecution was prevented by Supremacy Clause

---

[2]      *Available at* https://bit.ly/30IPwhR.

[3]      *Available* at https://pewrsr.ch/3JeGdHR.

[4]      *See* Sens. Mark R. Warner & Chuck Grassley, Press Release, *Statement of U.S. Sens. Mark R. Warner and Chuck Grassley on the Decision by the Department of Justice Not to Pursue Charges Against the Officers Who Shot and Killed Bijan Ghaisar* (Nov. 14, 2019), https://bit.ly/3qeH0jy; 166 Cong. Rec. S1713 (daily ed. Mar. 12, 2020) (statement of Sen. Grassley); Editorial Bd., *Why Did Park Police Officers Kill Bijan Ghaisar?*, Wash. Post (Sept. 26, 2019), https://wapo.st/3sh03we.

[5]      Editorial Bd., *Opinion: Justice for Bijan Ghaisar Has Been Delayed—But Not Yet Denied*, Wash. Post (May 4, 2021, 9:00 a.m.), https://wapo.st/3Ei8qKa; Reps.

immunity, the victim's family, lawmakers, and the press lamented how federal officers easily evade justice.[6] Thus, some perceived this case as another example of an unfair, unjust system of enforcing criminal laws.[7]

Compounding that concern, state prosecutions are often the *only* way that law-breaking federal officers can be held accountable. Because federal law criminalizes

---

Jennifer Wexton & Don Beyer & Congresswoman Eleanor Holmes Norton, Press Release, *Joint Statement on Charges Filed Against U.S. Park Police Officers in the Killing of Bijan Ghaisar* (Oct. 15, 2020), https://bit.ly/3soh5si; Sen. Mark R. Warner, Press Release, *Sen. Warner on Fairfax Commonwealth's Attorney Charges Against the U.S. Park Police Officers Involved in the 2017 Shooting Death of Bijan Ghaisar* (Oct. 16, 2020), https://bit.ly/3smQnQI.

[6]     Tom Jackman, *Manslaughter Case in Park Police Killing of Bijan Ghaisar Moves to Federal Court*, Wash. Post (Apr. 23, 2021, 6:18 p.m.), https://wapo.st/32r4XvS ("James Ghaisar, Bijan Ghaisar's father, said, 'I believe if the officers were local . . . we would have had much, much faster results. But because they're federal officers, it's been 1,253 days since they killed my son."); Editorial Bd., *Opinion: In the Bijan Ghaisar Case, the Police Get Away With It*, Wash. Post (Oct. 24, 2021, 8:00 a.m.), https://wapo.st/3qdkMOL (criticizing the district court's grant of immunity); Editorial Bd., *Opinion: It's Hard to Hold Police Accountable. For Federal Agents, It's All but Impossible*, Wash. Post (Sept. 22, 2021, 1:04 p.m.), https://wapo.st/3Fiw9LD (criticizing federal officers' immunity generally); Sen. Mark R. Warner, Press Release, *Statement of U.S. Sen. Mark R. Warner on Dismissal of All Criminal Charges Against the Two U.S. Park Police Officers Involved in the 2017 Shooting Death of Bijan Ghaisar* (Oct. 22, 2021), https://bit.ly/3FhN68S.

[7]     *See* Tom Jackman, *Judge Dismisses Criminal Charges Against Park Police Officers in Bijan Ghaisar Slaying*, Wash. Post (Oct. 22, 2021, 4:25 p.m.), https://wapo.st/30KD8y1 ("'Today is another affirmation that the system is built to cover up wrongdoing by police in our country,' Ghaisar's family said in a statement . . . ."); Editorial Bd., *It's Hard to Hold Police Accountable*, *supra* (equating this case with others, "infuriating to ordinary Americans," in which federal officers have not faced consequences for deadly shootings).

conduct in only limited contexts, *see Torres*, 578 U.S. at 457-58, often a federal officer engaged in wrongdoing does not actually commit a federal crime, *see, e.g.*, 18 U.S.C. § 1112 (criminalizing manslaughter under federal law but only "[w]ithin the special maritime and territorial jurisdiction of the United States").  Although, as relevant in officer-shooting cases like this one, it is a federal crime to willfully deprive someone of his/her federal rights, 18 U.S.C. § 242, federal prosecutors rarely pursue such charges because the elements are notoriously hard to prove, Taryn A. Merkl, *Protecting Against Police Brutality and Official Misconduct: A New Federal Criminal Civil Rights Framework* 4, 6-7, Brennan Ctr. for Just. (Apr. 29, 2021).[8] Nor can victims always find success with civil suits for damages because claims against either federal officers personally or the United States are restricted.  *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 742-43 (2020) (discussing limited availability of suits against federal officers personally); *Butz v. Economou*, 438 U.S. 478, 507 (1978) (holding that qualified immunity is available to federal officers); 28 U.S.C. § 2680 (listing exceptions to the United States' waiver of immunity for certain tort claims).  With few avenues for justice, this Court should be cautious to limit the most obvious and appropriate: state prosecutions.

---

[8]     *Available at* https://bit.ly/3qgtoWd.

**II.    This Court Should Clarify The Standard For Granting Supremacy Clause Immunity.**

This Court should carefully apply the two-prong standard that the Supreme Court articulated over a century ago in *Neagle*.  There, the Court held that a federal officer is immune (1) "for an act which he was authorized to do by the law of the United States, which it was his duty to do as [an officer] of the United States," and (2) "if, in doing that act, he did no more than what was necessary and proper for him to do."  135 U.S. at 75.  On *Neagle*'s first prong, this Court should observe the limits on federal officers' authority written into statutes, regulations, and agency policies.  On *Neagle*'s second prong, this Court should cabin what actions are truly necessary and proper to perform an officer's duties, and preclude immunity when officers engage in unconstitutional conduct.  By narrowly implementing this standard, this Court can ensure that Supremacy Clause immunity remains rightfully limited to cases of "an exceptional nature."  *Birsch*, 31 F.2d at 816 (quoting *Drury*, 200 U.S. at 7).

**A.    Under *Neagle*'s first prong, courts should carefully enforce limits on federal authority.**

The first *Neagle* prong asks whether the federal officer's act "was authorized . . . by the law of the United States" and whether "it was his duty" to act.  135 U.S. at 75.  The district court found this prong fulfilled because the "officers were United States Park Police Officers who were on duty, in uniform, and patrolling

within their jurisdiction in a marked . . . patrol car," and that their duties "included responding to crimes, traffic violations, and accidents that occurred along the George Washington Parkway and pursuing violators in adjoining jurisdictions." *Virginia v. Amaya*, No. 1:21-cr-91, 2021 WL 4942808, at *2 (E.D. Va. Oct. 22, 2021); *see Virginia v. Vinyard*, No. 1:21-cr-92, 2021 WL 4942807, at *2 (E.D. Va. Oct. 22, 2021). That high-level description of the officers' duties, however, ignored clear limits on the officers' authority as set forth in statutes and agency policies. Carefully enforcing the limits on officers' authority, including all relevant statutes and agency policies, comports with precedent and respects important lines dividing federal and state power.

Precedent from the Supreme Court and this Court instruct that when federal law places limits on an officer's authority and duties, courts should enforce them. A federal job, like any job, involves specific duties and roles; but unlike other jobs, those duties and roles are often contained in statutes, regulations, or agency policies. *See, e.g.*, 54 U.S.C. § 102701(a)(2) (listing "[p]owers and duties" of officers within the Department of the Interior, including Park Police). Because the federal government has limited powers, federal officers might have specific limits placed on how they do their jobs. *See, e.g.*, JA 111-19 (prescribing limitations on how Park Police officers are to handle vehicular pursuits). "[A] federal official may not with

17

impunity ignore the limitations which the controlling law has placed on his powers." *Butz*, 438 U.S. at 489.

The Supreme Court and other courts have applied those principles when deciding the boundaries of Supremacy Clause immunity. For example, in *Drury*, the Supreme Court held that an army officer in charge of a federal arsenal was not entitled to immunity when his acts occurred just off arsenal property and beyond his geographic jurisdiction. 200 U.S. at 7-8. In *Ivory*, this Court held that a federal truck driver could not claim immunity from a state prosecution for violating traffic laws when his act also violated a standing order and guidance specifying how to handle rights-of-way. 906 F.2d at 1002. And, in cases where federal agents shot or brandished a gun at a civilian but defended themselves by claiming they were effecting an arrest, courts have parsed the statute giving the officer arrest authority and other statutes defining arrestable offenses to determine if an arrest was actually permitted. *See, e.g.*, *Battle v. State*, 258 A.3d 1009, 1022-26 (Md. Ct. Spec. App. 2021); *State v. Deedy*, 407 P.3d 164, 188-89 (Haw. 2017). In short, case law makes clear that when federal law and policy outlines an officer's authorities and duties, and the officer oversteps those limits, his act was not authorized by federal law and cannot form a basis for Supremacy Clause immunity.

*Neagle* is not to the contrary. There, the question was whether a federal marshal acted within the scope of his authority when using deadly force to defend a

Supreme Court Justice. 135 U.S. at 5, 58-59. The *Neagle* Court located broad authority in the executive's power under the Constitution to appoint officers to protect judges, *id.* at 67-68, a federal statute providing that federal marshals have the same powers as state sheriffs, and a California law providing that a sheriff's duty included "prevent[ing] and suppress[ing] all affrays," *id.* at 68 (internal quotation marks and citations omitted). The marshal's conduct fell squarely into those bounds of authority, *id.* at 69, and the Court had no reason to address whether the result would be different if his conduct was at the margins or his duties were more circumscribed. Notably, when the Court in *Drury* (decided after *Neagle*) confronted clear, geographic limits on federal authority, the Court enforced them. *Drury*, 200 U.S. at 7-8. Together, these cases stand for the proposition that when there are discernible, applicable limits on federal authority, courts must heed them.

Furthermore, respecting textual limits on federal authority prevents federal infringement on state sovereignty. "[T]he Federal Government 'can act only through its officers and agents, and they must act within the States.'" *Mesa*, 489 U.S. at 126 (quoting *Davis*, 100 U.S. at 263). Thus, when courts broadly and uncritically interpret federal officers' duties, federal power grows—necessarily at the expense of states. That is antithetical to our constitutional system. Federal power is supposed to be limited, so courts should not easily read federal law to permit an aggrandizement of federal power—especially at the expense of states' criminal

powers. *Bond*, 572 U.S. at 858-59. Otherwise, the line between federal and state power will erode. *See Ivory*, 906 F.2d at 1002 ("[I]f every traffic violation involving a military driver could be removed to a federal forum, it would quickly transform these tribunals into local traffic courts.").

Applying those principles here, the district court's analysis of *Neagle*'s first prong was incomplete. In one sentence, unadorned with citation to authority, the district court concluded that "[t]he officers' duties included . . . pursuing violators in adjoining jurisdictions." *Amaya*, 2021 WL 4942808, at *2. Yet the pursuit here extended into a Virginia residential neighborhood, and Park Police officers' duties to pursue and arrest someone in that context have limits. *See* Va. Br. 25-37. Most significantly, Park Police officers may make warrantless arrests for federal *felonies*. 54 U.S.C. § 102701(a)(2)(B). And the arrest must occur within the Park System unless the person has fled (although flight itself is not an arrestable or pursuable offense). *See id.*; JA 111. Despite these limitations on the officers' authority, however, the district court never found that the officers could have thought that the victim committed a federal felony. Without that fact established, the officers would have lacked authority to arrest or pursue the victim into Virginia. The lower court thus incorrectly overlooked geographic limits on federal authority (which were key in *Drury*, 200 U.S. at 7-8) and textual limits on an officer's arrest power (which were key in *Battle*, 258 A.3d at 1022-26, and *Deedy*, 407 P.3d at 188-89). This Court

should correct that failure and impose proper limits on federal authority under *Neagle*'s first prong.

## B. *Neagle*'s second prong should require a substantial showing of necessity and constitutionality.

*Neagle*'s second prong requires that an officer, in performing an authorized act, "did no more than what was necessary and proper." 135 U.S. at 75. In applying that prong here, the district court erred in two ways. First, it focused narrowly on the reasonableness of the officers' actions, rather than whether they were *necessary*. Second, it failed to inquire whether the officers violated the Constitution. This Court should correct those errors and clarify the appropriate showings to satisfy the second prong.

> 1.   The standard under the second prong must be higher than bare reasonableness.

In applying *Neagle*'s second prong, the district court fixated on whether the officers' actions were reasonable. *Amaya*, 2021 WL 4942808, at *2 (finding that the circumstances "reasonably invoked" a belief that the officers were in "imminent, life-threatening danger" and that "belief was reasonable"). But the standard is not reasonableness—it is "no more than what was necessary and proper." *Neagle*, 135 U.S. at 75.[9]

---

[9]     Although "necessary and proper" evokes the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, the Supreme Court has never suggested that its use of

Two cases from this Court are instructive.  In *Ivory*, a federal truck driver drove through an intersection without stopping (in violation of state right-of-way laws), but he argued that because cars had stopped, he assumed he had the right of way.  906 F.2d at 1002.  This Court held that his assumption, while perhaps a valid defense to a state prosecution, was insufficient to claim a federal immunity defense. *Id.*  Notably, it did so over a dissent that argued that Ivory's actions entitled him to immunity precisely because they were "reasonable, even though mistaken."  *Id.* at 1007 (Phillips, J., dissenting).  In *Cisneros*, this Court later characterized *Ivory*'s holding as requiring "a federal officer [to] show that the accident resulted from an exigency or emergency related to his federal duties which *dictated* or *constrained* the way in which he was *required* to, or could, carry out those duties."  947 F.2d at 1139 (emphases added).  Said another way, a "reasonable, though mistaken, belief" could not suffice.  *Id.*  *Ivory* and *Cisneros* thus make clear that "the acts themselves must of necessity be required in the discharge of the officer's duties" in order to

---

the phrase derives from that Clause.  Nor has this Court referred to the Clause. Moreover, as even courts that use a reasonableness standard recognize, the meaning of "necessary and proper" as used in the Necessary and Proper Clause "cannot be the definition of Supremacy Clause immunity because it would imply that federal officers are virtually unlimited in their choice of appropriate means (including violation of state law) to carry out federal policy."  *Livingston*, 443 F.3d at 1220 n.4. The Court's cases, which have often denied immunity, do not suggest that immunity is so broad.  *Id.*

justify Supremacy Clause immunity. *New York v. De Vecchio*, 468 F. Supp. 2d 448, 460 (E.D.N.Y. 2007) (construing *Ivory* and *Cisneros*).

Courts that have concluded otherwise appear to have read a reasonableness standard into *Neagle* that does not exist. *E.g.*, *Livingston*, 443 F.3d at 1221 ("[T]he Court in *Neagle* was granting immunity for federal agents who *reasonably* believed that their acts were *necessary* to perform their duties."). The *Neagle* Court never once used the term "reasonable"; rather, the Court explained that the action must be "no more than what was necessary and proper." To be sure, as one court noted, the *Neagle* Court also stated that the officer had a "correct," "well-founded belief" that "he was justified" in acting. *Livingston*, 443 F.3d at 1221 (quoting *Neagle*, 135 U.S. at 76) (emphases omitted). But even words like "correct," "well-founded belief," and "justified" connote a high standard consistent with necessity. For example, beliefs can be "reasonable, though mistaken," i.e., incorrect. *Cisneros*, 947 F.2d at 1139.

Instead of reasonableness, courts should engage in a more holistic, searching inquiry to determine whether a federal officer's actions are necessary and proper. For instance, courts could look to the standard used to apply a necessity defense, considering (a) the "real and specific threat" the defendant faced, (b) whether the defendant "recklessly place[d] himself in a situation where he would be forced to engage in criminal conduct," (c) whether he had "reasonable legal alternative[s],"

23

and (d) whether the criminal act directly caused harm to be avoided. *United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989) (internal quotation marks and citations omitted). In applying these factors, courts should analyze each specific criminal act; it cannot be enough that an officer's conduct was generally reasonable. *See Horiuchi*, 253 F.3d at 370 n.18 ("[A] law enforcement officer must justify *every* use of deadly force as necessary and proper; he may not keep pulling the trigger, regardless of changed circumstances."). Weighing these factors would align with this Court's instruction that "the propriety of the acts of the federal officers" should be "beyond question" based on "consideration of the facts of the particular case." *Birsch*, 31 F.2d at 814.

### 2. Violating the Constitution exceeds what is "necessary and proper."

In addition, this Court should clarify that a federal officer exceeds what is necessary and proper whenever his conduct violates the Constitution.[10] This Court has explained that officers may be immune if they were "*lawfully* discharging their duties." *West Virginia v. Laing*, 133 F. 887, 892 (4th Cir. 1904) (emphasis added). As the Supreme Court has since elaborated, "[w]hatever level of protection from state interference is appropriate for federal officials . . . , it cannot be doubted that

---

[10]   As Virginia noted, whether a constitutional violation occurred could also be considered under the first *Neagle* prong. Va. Br. 38 n.14. Under whichever prong it fits, however, the point is that a constitutional violation should be sufficient to defeat a claim of Supremacy Clause immunity.

these officials, even when acting pursuant to congressional authorization, are subject to the restraints imposed by the Federal Constitution." *Butz*, 438 U.S. at 495. Accordingly, even courts that focus on reasonableness recognize that a federal officer's "actions fail to qualify as 'necessary and proper' if committed in violation of the negative injunctions of the Constitution." *Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009); *see Horiuchi*, 253 F.3d at 367 (analyzing the reasonableness of an officer's acts under Fourth Amendment standards).

Consistent with that principle, this Court should insist that a district court consider whether a federal officer has committed a constitutional violation if that issue is raised. Here, Virginia made clear, well-supported arguments that the officers violated the Fourth Amendment by using excessive force. Commw.'s Opp. to Mot. to Dismiss 18-19, *Virginia v. Amaya*, No. 1:21-cr-91 (E.D. Va. July 15, 2021), ECF No. 9; Commw.'s Opp. to Mot. to Dismiss 18-20, *Virginia v. Vinyard*, No. 1:21-cr-92 (E.D. Va. July 15, 2021), ECF No. 13. Deciding whether a violation occurred requires weighing several factors, including "the proportionality of the force" and "the severity of the crime at issue." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (internal quotation marks and citations omitted). However, the district court neither mentioned the Fourth Amendment nor considered those factors. This Court should correct that error.

## CONCLUSION

This Court should vacate the district court's orders dismissing the indictments and remand for further proceedings.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Principal Deputy Solicitor General

ASHWIN P. PHATAK
Deputy Solicitor General

ADAM J. TUETKEN
Assistant Attorney General

Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-6287
(202) 730-1864 (fax)
Loren.AliKhan@dc.gov

January 2022

On behalf of:

KWAME RAOUL
*Attorney General*
State of Illinois

BRIAN E. FROSH
*Attorney General*
State of Maryland

MAURA HEALEY
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

THOMAS J. DONOVAN, JR.
*Attorney General*
State of Vermont

ROBERT W. FERGUSON
*Attorney General*
State of Washington

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2022, I electronically filed the foregoing amicus brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN

**CERTIFICATE OF COMPLIANCE**

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 6,157 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14 point.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN