**Nos. 21-4584(L), 21-4589**

## In the

# United States Court of Appeals
## For the Fourth Circuit

––––––––––––––––

COMMONWEALTH OF VIRGINIA,

*Appellant,*

v.

ALEJANDRO AMAYA & LUCAS VINYARD,

*Appellees.*

––––––––––––––––

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

––––––––––––––––

**BRIEF OF WILLIAM P. BARR, EDWIN MEESE III, AND MICHAEL B. MUKASEY, FORMER ATTORNEYS GENERAL OF THE UNITED STATES; FEDERAL LAW ENFORCEMENT OFFICERS ASSOCIATION; AND LAW ENFORCEMENT LEGAL DEFENSE FUND, AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

––––––––––––––––

Benjamin L. Hatch
John S. Moran
James A. Compton
MCGUIREWOODS LLP
888 16th Street N.W.
Washington, DC 20006
(202) 828-2817

*Counsel for Former Attorneys General Barr, Meese, and Mukasey, Federal Law Enforcement Officers Association, and Law Enforcement Legal Defense Fund*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  21-4584 (L); 21-4589   Caption:  Commonwealth of Virginia v. Alejandro Amaya; Commonwealth of Virginia v. Lucas Vinyard

Pursuant to FRAP 26.1 and Local Rule 26.1,

Federal Law Enforcement Officers Association
(name of party/amicus)


 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?          ☐YES☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?          ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?          ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John S. Moran _____          Date: _____ April 21, 2022 _____

Counsel for: Amici Curiae _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  21-4584 (L); 21-4589    Caption:  Commonwealth of Virginia v. Alejandro Amaya; Commonwealth of Virginia v. Lucas Vinyard

Pursuant to FRAP 26.1 and Local Rule 26.1,

Law Enforcement Legal Defense Fund
(name of party/amicus)

who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John S. Moran                          Date:     April 21, 2022

Counsel for: Amici Curiae

iv

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF *AMICI* .................................................1

ARGUMENT ..........................................................................................5

I.    Supremacy Clause Immunity Is a Vital Doctrine with a Strong Historical Pedigree...........................................................................5

II.    The Court Should Reject the *Amici* States' Call to Scrutinize Officers' Compliance with Federal Policy.................................................13

III.    The Court Should Not Deviate from the Objective Reasonableness Standard. ................................................................................19

        A.    Established Law Holds that Federal Officers Cannot be Held Liable for Reasonable Mistakes of Constitutional Law.....................23

CONCLUSION ......................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allen*,
106 F.3d 582 (4th Cir. 1997) ...........................................................14

*Anderson v. Creighton*,
483 U.S. 635 (1987)........................................................................22

*Arizona v. United States*,
567 U.S. 387 (2012)....................................................................7, 16

*Barr v. Matteo*,
360 U.S. 564 (1959).........................................................................14

*Battle v. State*,
258 A.3d 1009 (Md. Ct. Spec. App. 2021).................................17, 18

*Baucom v. Martin*,
677 F.2d 1346 (11th Cir. 1982) ............................................11, 12, 13

*Bouie v. City of Columbia*,
378 U.S. 347 (1964).....................................................................3, 25

*Butz v. Economou*,
438 U.S. 478 (1978).........................................................................17

*Calley v. Callaway*,
519 F.2d 184 (5th Cir. 1975) ...........................................................23

*Clifton v. Cox*,
549 F.2d 722 (9th Cir. 1977) ................................................11, 12, 14, 15

*Commonwealth of Kentucky v. Long*,
637 F. Supp. 1150 (W.D. Ky. 1986).................................................13

*Commonwealth of Kentucky v. Long*,
837 F.2d 727 (6th Cir. 1988) .................................................11, 12, 13, 20

*Cunningham v. Neagle*,
135 U.S. 1 (1890)....................................................................*passim*

*United States ex rel. Drury v. Lewis*,
   200 U.S. 1 (1906) .................................................................................10, 11, 20

*In re Fair*,
   100 F. 149 (D. Neb. 1900) ...................................................................23

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ...............................................................................22

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ...............................................................................25

*Kendall v. Stokes*,
   44 U.S. (3 How.) 87 (1845) ...............................................................17

*In re Lewis*,
   83 F. 159 (D. Wash. 1897) ...................................................................23

*Luna v. Holder*,
   637 F.3d 85 (2d Cir. 2011) ...................................................................16

*Marin-Rodriguez v. Holder*,
   612 F.3d 591 (7th Cir. 2010) ...............................................................16

*Maryland v. DeShields*,
   829 F.2d 1121 (4th Cir. 1987) .............................................................12

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ...................................................6, 7, 19

*Mesa v. California*,
   489 U.S. 121 (1989) ...............................................................................18

*Montana v. Christopher*,
   345 F. Supp. 60 (D. Mont. 1972) .......................................................23

*New York v. Tanella*,
   374 F.3d 141 (2d Cir. 2004) .................................................11, 12, 20

*North Carolina v. Cisneros*,
   947 F.2d 1135 (4th Cir. 1991) .............................................................12

*North Carolina v. Ivory*,
   906 F.2d 999 (4th Cir. 1990) ...............................................................12, 17, 18

*Ohio v. Thomas*,
   173 U.S. 276 (1899).........................................................................10, 16, 20, 21

*Osborn v. Bank of United States*,
   22 U.S. (9 Wheat.) 738 (1824) ...........................................................................17

*Pruidze v. Holder*,
   632 F.3d 234 (6th Cir. 2011) ...............................................................................16

*Saucier v. Katz*,
   533 U.S. 194 (2001).........................................................................................3, 25

*Statchen v. Palmer*,
   623 F.3d 15 (1st Cir. 2010).....................................................................................3

*State v. Deedy*,
   407 P.3d 164 (Haw. 2017).......................................................................2, 17, 18

*Tennessee v. Davis*,
   100 U.S. 257 (1879)................................................................................................7

*Texas v. Kleinert*,
   855 F.3d 305 (5th Cir. 2017) ........................................................................11, 12

*Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*,
   558 U.S. 67 (2009)...............................................................................................16

*United States v. Crittendon*,
   883 F.2d 326 (4th Cir. 1989) ...............................................................................21

*United States v. Lanier*,
   520 U.S. 259 (1997).............................................................................................25

*Wyoming v. Livingston*,
   443 F.3d 1211 (10th Cir. 2006) ..................................................2, 11, 12, 19, 22

**Constitutional Provisions**

U.S. CONST., art. II, § 3 .........................................................................................3

U.S. CONST., art. VI ...........................................................................................3, 6

**Statutes**

18 U.S.C. § 241 ...................................................................................4

18 U.S.C. § 242 ...................................................................................4

28 U.S.C. § 1442(a)(1) ..................................................................12, 18

**Other Authorities**

The Federalist No. 28 (Alexander Hamilton)
(Jacob E. Cooke ed., 1961) ..........................................................7

The Federalist No. 51 (James Madison)
(Jacob E. Cooke ed., 1961) ..........................................................7

*Remarks as Delivered by Attorney General William P. Barr at the
Major Cities Chiefs Association Conference*,
U.S. Department of Justice (Oct. 16, 2020),
http://www.justice.gov/opa/speech/remarks-delivered-attorney-
general-william-p-barr-major-cities-chiefs-association .....................4

Restatement (Second) of Agency §§ 228–49 (1958) ............................15

Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity?
Federal Officers, State Criminal Law, and the Supremacy Clause*,
112 Yale L.J. 2195 (2003) ...........................................................20

## INTRODUCTION AND INTEREST OF *AMICI*[1]

This case illustrates the sort of split-second decisions, on risk of death or serious bodily injury, that law enforcement officers may be called to make on any given day.  It also illustrates how those officers may later be forced to defend their split-second decisions, on threat of civil or criminal liability, against plaintiffs and prosecutors who have all the time in the world to build a case.

Fortunately, our Constitution and laws ensure that the threat of *post hoc* liability does not prevent those officers who act reasonably under trying circumstances from carrying out their official duties.  They do so by permitting liability only for those officers who act in an objectively unreasonable manner, and in the case of federal officers, by shielding their activities from the undue interference of the States.  The district court reached the right result in this case, and the Court should affirm based on a straightforward application of *Cunningham v. Neagle*, 135 U.S. 1 (1890), as it has consistently been applied in the lower courts for more than a century.

First, there should be no genuine dispute that Alejandro Amaya and Lucas Vinyard acted as federal officers when they executed a traffic stop on the George

---

[1] All parties have consented to the filing of this brief.  No party's counsel authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

Washington Parkway and then pursued a fleeing suspect. The *Amici* States urge this Court to conduct a probing inquiry into Park Police policies and each step they took along the way. But that is an invitation to error. Even if the Commonwealth and the federal courts were competent to adjudicate federal officers' compliance with departmental policy and the appropriateness of their steps to apprehend a fleeing suspect, those issues are simply beside the point here. The proper inquiry under *Neagle* is simply whether the officers were acting in the course of their official duties, *see, e.g.*, *Wyoming v. Livingston*, 443 F.3d 1211, 1227–28 (10th Cir. 2006) ("The question is not whether federal law expressly authorizes violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties.")—or instead, whether they were off doing something else, *see, e.g.*, *State v. Deedy*, 407 P.3d 164, 189 (Haw. 2017) ("Deedy does not explain how a night of socializing and drinking alcoholic beverages in Waikīkī with friends was part of his 'official duties' as a State Department agent.").

Second, the Court should affirm because, even if Amaya and Vinyard could have acted differently, their actions were not objectively unreasonable. The *Amici* States urge the Court to conduct a "holistic, searching inquiry," State Br. 23, and to hold that any action found in retrospect to exceed constitutional standards is *ipso facto* not "necessary and proper" under *Neagle*, *see id.* at 24–25. But it is a bedrock principle of American law that law enforcement officers are immune from suit for

reasonable mistakes of constitutional law, *see, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 205 (2001)—and that principle applies *a fortiori* to the criminal context, where the Due Process Clause guarantees that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed," *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964).

To allow the Commonwealth's prosecution would work a dramatic revision of American law. It would subject law enforcement officers to the "chilling effect", of criminal liability for reasonable actions that might later be determined to exceed constitutional bounds. *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010). And by exposing federal officers to state prosecution based on *post hoc* assessments of their conduct and compliance with federal policies, it would allow the States unduly to interfere with the prerogatives of the Federal Government, which administers "the supreme Law of the Land," U.S. CONST., art. VI, and of the President, who is ultimately responsible to "take Care that the Laws be faithfully executed," *id.*, art. II, § 3.

The undersigned *amici* have an interest in avoiding these consequences and in seeing the federal courts respect the legal protections afforded to federal law enforcement. William P. Barr served as Attorney General of the United States from 1991 to 1993, and again from 2019 to 2020. Edwin Meese III served as Attorney General of the United States from 1985 to 1988. Michael B. Mukasey served as

Attorney General of the United States from 2007 to 2009. In that role, they supervised federal law enforcement officers at the FBI, ATF, DEA, the Bureau of Prisons, and the U.S. Marshals Service. As head of the Department of Justice, they were also responsible for the investigation and prosecution of constitutional violations by law enforcement officers under 18 U.S.C. §§ 241, 242. The Federal Law Enforcement Officers Association (FLEOA) is a nonpartisan, nonprofit professional association representing the interests of more than 31,000 federal law enforcement officers from over 65 federal agencies. The Law Enforcement Legal Defense Fund is a benevolent and educational nonprofit organization that supports and defends the law enforcement profession and individual officers who have devoted their lives to public service. *Amici* believe that our Nation's law enforcement officers serve in "the most noble profession in our country," and that it is vital for our laws to protect them "from personal liability when they make good-faith errors in enforcing the law."[2]

*Amici* respect the States' prerogative to pass and enforce criminal laws and agree that courts should not lightly curtail that authority. But this is not a case about

---

[2] *Remarks as Delivered by Attorney General William P. Barr at the Major Cities Chiefs Association Conference*, U.S. Department of Justice (Oct. 16, 2020), http://www.justice.gov/opa/speech/remarks-delivered-attorney-general-william-p-barr-major-cities-chiefs-association.

States' lawmaking authority; it is a case about the legal protections afforded to federal law enforcement officers in our federal system of government.

## ARGUMENT

The district court appropriately dismissed the Commonwealth's charges against Amaya and Vinyard based on Supremacy Clause immunity. That doctrine is important to federal law enforcement officials and to our federal system. It also has a deep pedigree. Our Constitution and laws have consistently protected federal officials from state prosecution when they carry out their official duties, so long as they do not commit objectively unreasonable constitutional violations. The *Amici* States urge this Court to break from historical tradition, and from the consistent rulings of the Courts of Appeals, to conduct a more "searching inquiry," State Br. 23, into the officers' compliance with Park Police policy and their decisions along the way. But that approach has no sound basis in law or policy. The Court should reject it and affirm.

## I. Supremacy Clause Immunity Is a Vital Doctrine with a Strong Historical Pedigree.

The Supreme Court made clear more than a century ago that the Constitution and Laws of the United States protect federal officials from state prosecution for actions reasonably taken in furtherance of their official duties. *See Cunningham v. Neagle*, 135 U.S. 1 (1890).

This immunity has deep roots. The Founders who adopted the Supremacy

Clause, and the Supreme Court in its earliest Supremacy Clause cases, recognized the need to ensure that federal officers can act free from state interference. And that view has remained consistent ever since. From the seminal *Neagle* decision to the modern day, federal courts have recognized that federal officers—indeed law enforcement officials at every level—must be able to carry out their duties without undue interference from the threat of *post hoc* liability for reasonable conduct.

The Supremacy Clause provides, in relevant part, that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI. The animating principle of Supremacy Clause immunity is simple: "the states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). Thus, while the police power, including the power to define and punish crimes, is generally reserved to the States, that power may not be employed against the Federal Government to "exclude it from the exercise of any authority conferred upon it by the constitution, obstruct its authorized officers against its will, or withhold from it for a moment the

cognizance of any subject which that instrument has committed to it." *Neagle*, 135 U.S. at 62 (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)).

This immunity of the Federal Government—and of the officials through whom it acts—is an essential feature of our federal system. Much as the Separation of Powers provides a check on each branch of the Federal Government, federalism provides necessary checks on both state and federal governments. *See* The Federalist No. 28, at 179 (Alexander Hamilton) (Jacob E. Cooke ed., 1961); The Federalist No. 51, at 351 (James Madison).

From these first principles, it follows that federal officers must be immune from state prosecution for reasonable actions carried out in the course of their authorized duties. The Federal Government can "carry into execution" its laws only through its officers. Under our Constitution and laws, States can neither enact nor enforce laws that "retard, impede, burden, or in any manner control" officers of the United States in the execution of their duties. *McCulloch*, 17 U.S. at 436. And what the States cannot do expressly—for instance, regulate the enforcement of laws "entrusted to the discretion of the Federal Government," *Arizona v. United States*, 567 U.S. 387, 409 (2012)—they cannot do through *ad hoc* enforcement of generally applicable criminal law.

This notion was well settled when the Supreme Court decided *Cunningham v. Neagle* in 1890. There, a Deputy U.S. Marshal, David Neagle, was charged with

murder in California for fatally shooting David S. Terry while protecting U.S. Supreme Court Justice Stephen J. Field. *See* 135 U.S. 1. Terry and his wife had been involved in a federal lawsuit in which both Justice Field and Circuit Judge Lorenzo Sawyer of the U.S. Court of Appeals for the Ninth Circuit sat on a three-judge panel. *See id.* at 43. While that case was pending, the Terrys assaulted and threatened Judge Sawyer on a train from Fresno to San Francisco where they happened to be in the same railcar. *See id.* at 44–45. Later, when Justice Field announced a judgment against the Terrys in their civil case, an altercation erupted in which Mr. Terry punched out a Deputy Marshal's tooth before he could be restrained and Mrs. Terry reached for a pistol in her purse. *See id.* at 45. Deputy Neagle was present and helped subdue Mr. Terry. *See id*. While imprisoned for contempt, the Terrys made several threats on Justice Field's life, including to newspaper reporters. *See id.* at 46–47.

When Justice Field traveled to California after the Terrys' release, the Attorney General and U.S. Marshal appointed Deputy Neagle to protect Justice Field. *See id.* at 52. This time, it was Justice Field who encountered the Terrys on a train from Fresno, and a chaotic scene erupted. *See id.* at 52–53. Mr. Terry struck Justice Field twice in the face, and before he could strike a third time, Deputy Neagle shot him; Terry died a few minutes later. *See id*. After recounting this colorful scene, the Court expressed its view that, even as a private citizen, Deputy Neagle

"would have been justified in what he did in defense of Mr. Justice FIELD's life, and possibly of his own." *Id.* at 54. But the Court also recognized that this view was insufficient to warrant federal interference in a state prosecution; it had to determine whether the Constitution and Laws of the United States provided a basis for freeing Deputy Neagle from state custody. *See id*. And the Court concluded that they did.

The Court first ascertained that Deputy Neagle was carrying out federal duties even though he was on a train some 3,000 miles from Washington, D.C., where Justice Field performed his ordinary duties as a Supreme Court Justice. *See id.* at 56–58. The Court explained that Deputy Neagle was carrying out responsibilities under federal law "to protect the life of" Justice Field, who in turn was "engaged in the discharge of his duties as circuit justice of the ninth circuit, and was entitled to all the protection . . . which the law could give him." *Id.* at 57–58. In a move reminiscent of the *Amici* States' arguments about Park Police policy, the State of California argued that "there exists no statute authorizing any such protection as that which Neagle was instructed to give Judge FIELD." *Id.* at 58. But the Court was not convinced by such a cramped reading of federal immunity; it construed federal law "to extend in a liberal manner . . . to persons imprisoned for the performance of their duty," regardless whether federal law authorized the particular task. *Id.*

9

In answering concerns raised by two dissenting Justices, the Court summarized its conclusion in a way that has since been construed to call for a distinct analysis of the propriety of the officer's actions:

> [I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and ***if, in doing that act, he did no more than what was necessary and proper for him to do***, he cannot be guilty of a crime under the law of the state of California.

*Id.* at 75 (emphasis added). In context, however, the Court clearly did not conduct a "holistic, searching inquiry," State Br. 23, to gauge whether Deputy Neagle could have acted differently and avoided the fatal shot.

Since *Neagle*, the Supreme Court has addressed Supremacy Clause immunity only rarely. The two most notable decisions came within 20 years of *Neagle*. In *Ohio v. Thomas*, 173 U.S. 276 (1899), the Court held that Ohio could not prosecute a federal official for serving margarine in a home for disabled veterans without placing a sign in the window, as required under Ohio law. The Court held that Congress had appropriated money to buy the margarine, and that serving it "was therefore legal, any act of the state to the contrary notwithstanding," under the Supremacy Clause. *Id.* at 283–84.

In *United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906), the Court affirmed a denial of immunity for soldiers being prosecuted for murder. There was conflicting testimony about whether the fatal shots were fired in hot pursuit of a suspected

thief—or instead whether one soldier ordered, and the other soldier carried out, the execution of a civilian who had already surrendered to their pursuit. *See id.* at 3–5. The Court held that pre-trial immunity was unavailable in light of this "conflict of evidence" because it had been "conceded that if [the soldiers had executed the man after he surrendered], it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by the Federal law." *Id.* at 8.

In recent decades, Supremacy Clause immunity cases have arisen with somewhat greater frequency in the Courts of Appeals, which have uniformly applied robust immunity under *Neagle*. Beginning with *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977), the Second, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits have interpreted and applied Supremacy Clause immunity.[3] Those courts unanimously agree that federal authority under *Neagle* is a question of the officer's general role and authority, not specific authorization for the allegedly criminal act.[4] And they

---

[3] *See New York v. Tanella*, 374 F.3d 141, 144 (2d Cir. 2004); *Texas v. Kleinert*, 855 F.3d 305, 313 (5th Cir. 2017); *Commonwealth of Kentucky v. Long*, 837 F.2d 727, 734 (6th Cir. 1988); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977); *Wyoming v. Livingston*, 443 F.3d 1211, 1217 (10th Cir. 2006); *Baucom v. Martin*, 677 F.2d 1346, 1348 (11th Cir. 1982).

[4] *See Tanella*, 374 F.3d at 147 ("No one disputes that Tanella was acting in his capacity as a federal DEA Agent when he shot Dewgard."); *Kleinert*, 855 F.3d at 317 ("With probable cause of two federal felonies, Kleinert was authorized to arrest Jackson under 21 U.S.C. § 878."); *Long*, 837 F.2d at 745 ("[E]ven though an agent exceeds his express authority, he does not necessarily act outside of the authority conferred by the laws of the United States."); *Clifton*, 549 F.2d at 728 ("[E]ven though his acts may have exceeded his express authority, this did not necessarily

---

agree that, to the extent *Neagle* requires assessing specific actions, courts should not allow prosecution for a mistake unless the conduct was objectively unreasonable.[5]

Contrary to the suggestion of the *Amici* States, this Court did not adopt a contrary approach in *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990), or *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991). Those decisions were not about the substance of a Supremacy Clause immunity claim; they were both removal cases construing 28 U.S.C. § 1442(a)(1), the federal officer removal statute. Both cite *Neagle* exactly once, and both are limited by their terms to the pleading standards for federal officers seeking removal of their state traffic cases. *See Ivory*, 906 F.2d at 1002; *Cisneros*, 947 F.2d at 1139. By contrast, this Court has addressed the substance of a Supremacy Clause immunity in an unpublished opinion and followed the same approach as the other Courts of Appeals. *See Maryland v. DeShields*, 829 F.2d 1121 (4th Cir. 1987).[6]

---

strip petitioner of his lawful power to act under the scope of authority given to him under the laws of the United States."); *Livingston*, 443 F.3d at 1227–28 ("The question is not whether federal law expressly authorizes violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties."); *Baucom*, 677 F.2d at 1350 ("In *Neagle*, it was held that the necessary authority could be derived from the general scope of the officer's duties.").

[5] *See Tanella*, 374 F.3d at 147; *Kleinert*, 855 F.3d at 317; *Long*, 837 F.2d at 745; *Clifton*, 549 F.2d at 728; *Livingston*, 443 F.3d at 1228; *Baucom*, 677 F.2d at 1350.

[6] In *DeShields,* this Court held that the federal officer was authorized to act under federal law because he was driving the vehicle in question under the order of his superior officer. *See id.* at *5. The Court then held that the federal officer's conduct was necessary and proper because he "reasonably thought his conduct was necessary

The consistent history, from our Nation's founding to the modern doctrine, establishes that federal officials are protected from state prosecution for actions reasonably taken in furtherance of their official duties.

## II.    The Court Should Reject the *Amici* States' Call to Scrutinize Officers' Compliance with Federal Policy.

The core question under *Neagle*, which courts often describe as its "first prong," is whether the officer acted under the authority of federal law. *See Neagle*, 135 U.S. at 75. This is a straightforward inquiry. Courts ask simply whether the officer's conduct fell within the scope of his official duties. *See, e.g.*, *Baucom*, 677 F.2d at 1350 ("In *Neagle*, it was held that the necessary authority could be derived from the general scope of the officer's duties."). The *Amici* States urge the Court to ignore any "high-level description of the officers' duties" and instead to focus on "[c]arefully enforcing the limits on officers' authority, including all relevant statutes and agency policies." State Br. 17. But that approach is wrong and inconsistent with precedent.

First, the States' strict-scrutiny approach is incompatible with *Neagle*. After recounting the facts of that case, *see supra* pp. 7–9, the Supreme Court concluded that Deputy Neagle acted under federal authority because he was protecting Justice Field at the direction of the Attorney General and U.S Marshall. *See* 135 U.S. at 67–

and justifiable." *Id.* at *6 (quoting *Commonwealth of Kentucky v. Long*, 637 F. Supp. 1150 (W.D. Ky. 1986)).

68.  The Court recognized that no distinct statute provided for this protective detail and that the Deputy's instructions "prescribe[ed] no very specific mode of affording this protection." *Id*.  But those more granular details were irrelevant to the Court's conclusion that his actions were authorized "by the law of the United States." *Id*. at 75–76.  Allegations that Amaya and Vinyard deviated from Park Police policy are similarly irrelevant.  Because immunity arises from an officer's status as a federal agent, the relevant inquiry is not whether federal law specifically authorized his discrete acts, but whether he acted on behalf of the Federal Government.

Second, the State's proposed standard is inconsistent with federal law standards applied in the related areas of civil immunity and agency law.  *See Clifton v. Cox*, 549 F.2d 722, 726–28 (9th Cir. 1977).  It would mean a lower standard for imposing *criminal* liability on federal law enforcement officers than for imposing *civil* liability—when, if anything, the criminal standard should be more stringent.  Under *Barr v. Matteo*, 360 U.S. 564 (1959) (no relation), a federal official enjoys immunity from civil suit so long as "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997).  Applying this standard, this Court has recognized that the challenged acts of federal officers generally fall within the scope of their authority: "most § 1983 claims involve conduct that relates to, or flows from, conduct that the official is indeed

14

authorized to commit." *Id*. It would be perverse, and unfounded, to scrutinize officers' compliance with granular agency policies in order to impose criminal liability where no civil liability would attach.

The *Amici* States' proposed approach would also establish a criminal standard that is inconsistent with ordinary principles of agency law. Under those principles, it is irrelevant whether "an employer has authorized or permitted the employee's particular act as long as that act occurred in the scope of the employee's regular duties and employment." *Clifton*, 549 F.2d at 728 n.12 (citing Restatement (Second) of Agency §§ 228–49 (1958)). Since officers' immunity arises from their role as agents through whom the Federal Government carries out its functions, it would be misguided to subject them to a different (and materially worse in this instance) standard than the ordinary law of agency.

Third, the *Amici* States' approach would stretch state prosecutors and state courts beyond their competence. It is one thing to say that courts may adjudicate whether an officer's actions were authorized "by the law of the United States," *Neagle*, 135 U.S. at 75–76, for purposes of adjudicating Supremacy Clause immunity. It is something wholly different to establish a doctrine that empowers state prosecutors in the first instance and state courts in the last to adjudicate whether a federal officer has properly carried out his duties in compliance with departmental policy.

Fortunately, *Neagle* does require the courts to wade into these issues because Park Police policy is not "the law of the United States." 135 U.S. at 75–76. This phrase, "law of the United States," comes directly from the Supremacy Clause, which is unconcerned with mere department policy. The basic question under *Neagle* is whether the officer acted pursuant to *federal* law such that his authority was supreme over contrary *state* law. *See Thomas*, 173 U.S. at 284 ("The act of the governor in serving it was authorized by congress, and it was therefore legal, any act of the state to the contrary notwithstanding."). Departmental policy does not bear on that question. *See Arizona v. United States*, 567 U.S. 387, 445 (2012) ("I am aware of no decision of this Court recognizing that mere policy can have pre-emptive force.") (Alito, J., concurring in part and dissenting in part). Where Congress grants federal authority to an agent, that authority cannot be thwarted by bureaucratic policy any more than by the States. Even executive agencies with delegated regulatory or interpretive authority cannot restrict the authority conveyed on them by Congress. *See Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 83 (2009); *Pruidze v. Holder*, 632 F.3d 234, 240 (6th Cir. 2011); *Luna v. Holder*, 637 F.3d 85, 100 (2d Cir. 2011); *Marin-Rodriguez v. Holder*, 612 F.3d 591, 594 (7th Cir. 2010). A law enforcement officer does not cease to carry out the law of the United States because he fails to properly park his car under Park Police policy. *Cf.* Appellant Br. 44.

Finally, the cases on which the *Amici* States rely do not support the strict-scrutiny approach they propose. *See* State Br. 17–18 (citing *Butz v. Economou*, 438 U.S. 478, 491 (1978); *Battle v. State*, 258 A.3d 1009, 1022–26 (Md. Ct. Spec. App. 2021); *State v. Deedy*, 407 P.3d 164, 188–89 (Haw. 2017); *North Carolina v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990)). *Butz* is a civil case in which the Supreme Court held that federal officials carrying out discretionary functions are entitled to qualified immunity, rather than absolute immunity. The Court noted that federal immunity "began as a means of protecting [federal officials] in the execution of their federal statutory duties from criminal or civil actions based on state law." 438 U.S. at 489 (citing *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 865–66 (1824)). While the Court declined to grant absolute immunity, it reaffirmed that a federal officer generally cannot be held liable for "'acting to the best of his judgment and from a sense of duty.'" 438 U.S. at 491 (quoting *Kendall v. Stokes*, 44 U.S. (3 How.) 87, 98 (1845)). Nothing in *Butz* supports the *Amici* States' view that a federal official cannot invoke Supremacy Clause immunity if a court later concludes that he failed to comply with agency policy.

*Battle* and *Deedy* address immunity from state prosecution, but they do not support the rule that *Amici* States propose. In *Battle*, a Maryland court rejected a claim of Supremacy Clause immunity where an off-duty DHS agent shot a man at a convenience store; the court relied on the lower court's conclusion that the off-duty

17

agent "was not performing his governmental duty, but was acting out of a personal motive and malice when he assaulted [the victim]." 258 A.3d at 1019. Similarly, in *Deedy*, the Supreme Court of Hawaii rejected a claim of Supremacy Clause immunity where an off-duty agent of the Diplomatic Security Service fatally shot a man at a fast food restaurant and failed to "explain how a night of socializing and drinking alcoholic beverages in Waikīkī with friends was part of his 'official duties' as a State Department agent." 407 P.3d at 189. These cases of off-duty agents are a far cry from Amaya and Vinyard who were on-duty and in pursuit of a fleeing suspect when the incident occurred. Nothing in those cases supports the *Amici* States' argument that courts should scrutinize compliance with departmental policy under *Neagle*.

And as noted above, *see supra* p.12, this Court's decision in *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990), construed the standards for federal removal of traffic cases under 28 U.S.C. § 1442(a)(1) and the Supreme Court's decision in *Mesa v. California*, 489 U.S. 121 (1989). Nothing in *Mesa* or *Ivory* supports the strict-scrutiny approach to the *Neagle* standard that the *Amici* States propose.

In sum, the Court should apply *Neagle* consistent with the decision itself and with the reading of the other Courts of Appeals and should reject the *Amici* States' proposal to conduct a searching review of the officers' compliance (or alleged noncompliance) with departmental policy.

18

III.    **The Court Should Not Deviate from the Objective Reasonableness Standard.**

To the extent the Court conducts a separate inquiry into whether the officers'

actions were "necessary and proper," *Neagle*, 135 U.S. at 75, the Court should apply

a standard of objective reasonableness.    The *Amici* States instead argue for a

"holistic, searching inquiry," State Br. at 23, under which an officer's actions are

never "necessary and proper" if later judged to exceed constitutional limits, *see id.*

at 24–25.    But that approach is inconsistent with the purposes of Supremacy Clause

immunity and would prove to be entirely unworkable.    Other Courts of Appeals have

rejected such an inquiry in favor of an objective reasonableness standard, and this

Court should do the same.

A standard of objective reasonableness best serves the purposes of the

Supremacy Clause, which include ensuring that the States do not "retard, impede,

burden, or in any manner control" the execution of federal law.    *McCulloch*, 17 U.S.

at 436.[7]    Instead of allowing the Federal Government to conduct its business free

from interference, the *Amici* States' proposed standard would mire the Federal

Government in fact-intensive litigation—or worse, deter federal officials from

soundly exercising their discretion.    An objective reasonableness standard, on the

---

[7] Some Courts of Appeals have considered whether *Neagle* also requires an assessment of subjective reasonableness.    *See Livingston*, 443 F.3d at 1220 (summarizing cases).    The Court need not do so here, as the district court held that Officers Amaya and Vinyard acted without any improper motivation.

other hand, at least ensures that officers will not be unfairly surprised, which is likely why every other Court of Appeals has adopted it.

Supremacy Clause immunity is needed to "protect[] federal operations from the chilling effect of state prosecution." *Tanella*, 374 F.3d at 147. It not only prevents prosecution of individual officers, but also ensures that federal officers do not have to "acquaint themselves with up to fifty potentially different normative regimes, depending on where in the country they are deployed." Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 Yale L.J. 2195, 2224 (2003). The immunity also means than an officer does not need to "run the gauntlet of standing trial" where he is immune to conviction. *Long*, 837 F.2d at 752.

These *Amici* States' proposed approach, by contrast, undermines these goals. First, their inquiry focuses primarily on state criminal law—specifically, whether the officer had a sufficient justification for engaging in conduct that the State has proscribed. *See* State Br. 23–24. But the Supremacy Clause does not give federal officers a state-law justification for violating criminal statutes; it renders them immune from state prosecution. *See Neagle*, 135 U.S. at 76 (holding that Deputy Neagle was "not liable to answer in the courts of California on account of his part in that transaction"); *Thomas*, 173 U.S. at 284 (the officer charged with violating Ohio's margarine ban was "not subject to that law"); *Drury*, 200 U.S. at 8

(characterizing immunity as a matter of state court *jurisdiction*, not substantive state law). To avoid state interference with federal activity, the applicable standard cannot simply incorporate state law. Otherwise, States could interfere with federal activities by passing unusual or vague criminal laws, forcing federal officials to familiarize themselves with—and to try to discern the content of—50 different legal regimes.

Second, a searching factual inquiry is incompatible with the concept of immunity from suit. To avoid forcing officers to undergo unnecessary trials at the risk of their personal liberty, the Supremacy Clause provides immunity to suit, not just a shield from liability. *See Neagle*, 135 U.S. at 75 ("When these things are shown . . . [t]here is no occasion for any further trial in the state court"); *Thomas*, 173 U.S. at 284 ("The state court had no jurisdiction to try the appellee for the offense charged in the written complaint made to the magistrate."). In contrast, the defense of justification, which the *Amici* States propose as a gloss on *Neagle*'s "necessary and proper" language, is a four-part, fact-specific defense available to criminal defendants *at trial*. *See, e.g., United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). A fact-intensive standard is not workable in the immunity context. Federal officials would have to "run the gauntlet" to establish their immunity, undergoing trial in all but name. And even if the State could not ultimately convict, it would still mire the official in this mini trial, effectively circumventing the immunity and undermining its very purpose.

21

An objective reasonableness standard better serves the purposes of Supremacy Clause immunity and is consonant with the tests applied in similar areas of law. A reasonableness standard employs an objective evaluation of the officer's actions in their factual context, divorced from considerations of state law. It can also be easily deployed at an early stage, requiring only relatively preliminary factual development. These considerations are a large part of why other immunity doctrines, like qualified immunity, employ a reasonableness standard.

Qualified immunity and Supremacy Clause immunity serve the same broad purpose: "reduc[ing] the inhibiting effect that a civil suit or prosecution can have on the effective exercise of official duties by enabling government officials to dispose of cases against them at an early stage of litigation." *Livingston*, 443 F.3d at 1221 (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). For qualified immunity, the Supreme Court applies a reasonableness standard because it "avoid[s] excessive disruption of government and permit[s] the resolution of many insubstantial claims on summary judgment" while "provid[ing] no license to lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Reasonableness is well-suited to Supremacy Clause immunity for the same reasons.

As the district court determined below, Officers Amaya and Vinyard had an objectively reasonable belief that their actions were justified by Ghaisar's conduct.

That should be the start and end of the Court's inquiry into whether their actions were "necessary and proper" under *Neagle*.

### A. Established Law Holds that Federal Officers Cannot be Held Liable for Reasonable Mistakes of Constitutional Law.

The *Amici* States also suggest that "a federal officer exceeds what is necessary and proper whenever his conduct violates the Constitution." State Br. 24. Once again, they propose a standard inconsistent with established law. Federal law does not hold law enforcement officers liable for reasonable mistakes in on-the-spot constitutional decision-making. Thus, even if the States were correct that "necessary and proper" involves an assessment of constitutionality, they would be mistaken to suggest that courts should conduct essentially *de novo* review of an officer's real-time decisions.

Federal courts have a long history of declining to impose criminal liability on federal officers based on reasonable errors in judgment. *See e.g., Calley v. Callaway*, 519 F.2d 184, 193 (5th Cir. 1975); *Montana v. Christopher*, 345 F. Supp. 60 (D. Mont. 1972); *In re Fair*, 100 F. 149 (D. Neb. 1900); *In re Lewis*, 83 F. 159 (D. Wash. 1897). The *Amici* States nevertheless contend that an officer's actions are not "necessary and proper"—and that he thus loses his immunity and becomes amenable to state prosecution—whenever a court later determines that his conduct exceeded constitutional standards. *See* State Br. 24–25. But that would be a jarring change in federal law.

23

And the *Amici* States themselves point out why this would be such a bad idea: constitutional law is often unclear, and we do not expect officers to make precise on-the-spot calls about the constitutionality of their actions. *See* State Br. 9. The *Amici* States raise this point to suggest that state criminal law should be treated differently from constitutional standards because it provides "clarity" and "fair warning" that constitutional law may not. *Id.* But that argument turns the Supremacy Clause on its head. The whole point of Supremacy Clause immunity is that federal officials in the field should act on federal standards—whether constitutional or otherwise—and should be responsive to the Federal Government, not act on state standards and be responsive to the threat of prosecution by state officials.

The Court should also avoid the *Amici* States' suggestion of strict liability for constitutional violations because, as the Supreme Court has often suggested, it may violate the Due Process Clause to impose criminal liability on law enforcement officers for reasonable mistakes of constitutional law. In the context of qualified immunity, the Court has made clear that officers need clear notice that their actions exceeded constitutional bounds before they can be subjected to *post hoc* liability:

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001). This is not an idiosyncratic principle limited to qualified immunity. The reasonableness or "clearly established" standard exists "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). And while notice is important in civil cases, it is vital in criminal cases. The Due Process Clause imposes a "fair warning" "requirement" under which "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie*, 378 U.S. at 351.

Finding a defendant criminally liable without fair warning is unconstitutional. *See id.* The Supreme Court has recognized that the "clearly established" portion of the qualified immunity inquiry is "simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *United States v. Lanier*, 520 U.S. 259, 270–71 (1997). Thus, holding officers criminally liable for reasonable mistakes of constitutional law would likely violate their right to fair warning under the Due Process Clause.

25

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision below.

Dated: April 21, 2022                 Respectfully submitted,

**William P. Barr**

**Edwin Meese III**

**Michael B. Mukasey**

**Federal Law Enforcement Officers Association**

**Law Enforcement Legal Defense Fund**

*By Counsel*

  /s/ John S. Moran
Benjamin L. Hatch
John S. Moran
James A. Compton
McGuireWoods LLP
888 16th Street N.W.
Washington, DC 20006
Telephone:  (202) 828-2817
bhatch@mcguirewoods.com
jmoran@mcguirewoods.com
jcompton@mcguirewoods.com

*Counsel for Amici William P. Barr; Edwin Meese III; Michael B. Mukasey; Federal Law Enforcement Officers Association; and Law Enforcement Legal Defense Fund*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) because it contains 6,387 words.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

Dated: April 21, 2022

**William P. Barr**

**Edwin Meese III**

**Michael B. Mukasey**

**Federal Law Enforcement Officers Association**

**Law Enforcement Legal Defense Fund**

*By Counsel*

*/s/ John S. Moran*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2022, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the system.

Dated: April 21, 2022

**William P. Barr**

**Edwin Meese III**

**Michael B. Mukasey**

**Federal Law Enforcement Officers Association**

**Law Enforcement Legal Defense Fund**

*By Counsel*

*/s/ John S. Moran*